**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

JEFFREY DANIEL GREER,
       *Defendant-Appellant.*

No. 09-10095

D.C. No.
2:07-CR-00120-
RLH-GWF-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Chief District Judge, Presiding

Argued and Submitted
June 14, 2010—San Francisco, California

Filed April 7, 2011

Before: Mary M. Schroeder and Jay S. Bybee,
Circuit Judges, and Owen M. Panner, District Judge.*

Opinion by Judge Bybee;
Dissent by Judge Panner

---

*The Honorable Owen M. Panner, Senior United States District Judge
for the District of Oregon, sitting by designation.

## COUNSEL

Peter S. Levitt, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff-appellee.

Jason F. Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

**OPINION**

BYBEE, Circuit Judge:

Jeffrey Greer was convicted by a jury of two counts of extortion under the Hobbs Act, 18 U.S.C. § 1951, and two counts of racketeering under 18 U.S.C. § 1952. On appeal, he argues first, that the district court failed to give a specific intent instruction and then proffered conflicting jury instructions that negated a mens rea element of extortion, and second, that the government improperly asked Greer to comment on the veracity of other witnesses during cross-examination. We review for plain error and we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Greer Discovers Confidential Documents*

In March 2007, while employed as a truck driver for French Trucking, Greer picked up bales of paper from Secured Fibers, a North Las Vegas recycling company, and delivered the bales to a plant in Alabama. After plant workers unloaded the paper, several hundred documents—about fifty pounds of paper that had come loose from the wired bales— still remained on the floor of the trailer. These documents contained sensitive information about the clients of several Las Vegas casinos—primarily Harrah's Entertainment and MGM/Mirage—including the clients' social security numbers, account numbers, betting limits, and betting habits. The casinos had contracted with Secured Fibers to collect these confidential documents and destroy them.

Once Greer examined the "ankle deep" paper that remained in his truck, he came to several realizations: he realized that the documents were confidential; that they should have been shredded; that the casinos would not want them publicized; and that the casinos might be willing to pay him a substantial amount of money to prevent the documents' disclosure.

Indeed, Greer testified he "was retiring from trucking that day" because he thought he could get half a million dollars from the casinos for the return of the documents.

Several days later, Greer contacted Vicki French—his boss and one of the owners of French Trucking—and asked her if he could keep "anything that was left in the trailer." Greer, however, concealed from his employer precisely what he had found. When French asked Greer to clarify his question, Greer did not ask whether he could keep confidential documents that remained in his truck. Rather, he asked: "[I]f I have some of that *grass seed* left in the trailer [from a previous delivery], can I take it home and plant it in my yard?" French answered that he could.[1]

B.   *Greer Contacts the Casinos and Tries to Obtain Money*

After obtaining his employer's permission to take home grass seed left in his trailer and plant it in his yard, Greer contacted the casinos. On April 27, 2007, Greer telephoned Harrah's Entertainment and told Security Director Henry Wilks he had information regarding players' accounts, social security numbers, and credit amounts. Greer further told Wilks he could obtain confidential information whenever he wanted because Harrah's had a "hole" in its system and offered to "plug" this "hole" if he was hired as a consultant. During the course of this conversation, Greer refused to identify himself or specify how he had obtained the clients' confidential information.

Five days later, Greer called Wilks again. After reiterating his desire to be hired as a consultant, Greer told Wilks that he had contacted an attorney and that the attorney advised him not to use the information Greer had in his possession.

---

[1]French later testified that had Greer told French what was really in the trailer, she would have instructed Greer to deliver the documents to her and she would have returned the documents to their owners.

Accordingly, Greer told Wilks that if a deal could not be made, he would "trash the information," but also warned Wilks that he could get more information in "two minutes whenever he wanted."

The following day, Greer spoke with Harrah's investigator, Randy Riley. This time, Greer identified himself as "Jeff" and told Riley not to trace the call. Greer informed Riley he had a significant amount of personal information regarding the casino's clients but refused to reveal how he obtained the information until the casino made Greer its "best offer." Additionally, Greer boasted he could obtain more information at any time and gave Riley an ultimatum: if the casino's offer was not ready by May 7, 2007, Greer would either disclose the information to the media or "seek other avenues."

At this point, Harrah's Entertainment contacted the FBI and reported Greer's "extortion attempt." Then, in an effort to develop evidence leading to Greer's arrest, Harrah's agreed to record future conversations with Greer and to offer Greer a fake "short-term security consulting contract." The casino also planted fake information in its employee database to determine—in later conversations with Greer—whether Greer had access to the database.

On May 7, 2007, frustrated that no deal had been made, Greer left a voice message directing the casino's officials to an auction listed on eBay. When Harrah's Entertainment's officials visited the website, they saw a hand grasping a pair of animal testicles with the caption: "A Large Gaming Company's Family Jewels." The auction site listed a starting bid of $100,000 and promised "inside business information" about a "large gaming company's" guests. This inside business information included casino restaurants and shops information (how much each earned and what credit cards were used), hotel guest information (who stayed in what room, how long they stayed, and any special requests made), and player information (social security numbers, credit limits, and tax

information). Additionally, the posting promised unlimited access to this information.

Because Harrah's Entertainment viewed this posting as a "very serious threat," it offered Greer $5,000 in exchange for learning how Greer acquired the confidential information. Greer, however, was insulted by Harrah's offer, dismissed it as "ridiculous," and instead demanded a $250,000 "security consulting contract" and a $100,000 "bonus" to play in the World Series of Poker. With the FBI's acquiescence, Riley feigned interest in Greer's counter-proposal and arranged a "round table meeting" to finalize the deal. Harrah's, however, had no intention of paying Greer anything. Rather, undercover officers posing as casino executives planned to arrest Greer at the meeting scheduled for May 9, 2007, as soon as Greer signed the bogus contract and accepted the check for $250,000.

While en route to the meeting, Greer called Paul Urban, Harrah's Entertainment's Corporate Investigator and asked him if he "could keep a secret." When Urban answered affirmatively, Greer disclosed how he had discovered the information. Specifically, Greer told Urban he was a truck driver who picked up a load of paper from Secured Fibers and discovered a "handful" of documents left in his truck. Greer further said he knew the documents were confidential and he had "never bluffed a big company before." At the end of this conversation, Urban immediately notified Riley to cancel the casino's contract with Secured Fibers.

When Greer met with Harrah's officers and the undercover FBI agents, he accepted a check for $250,000 and a document purporting to be a security consulting contract. After the FBI agents arrested him, Greer told the agents that "he thought his actions were legal," and that he "had every right" to take the documents from his trailer. He further stated that he "capitaliz[ed] on somebody else's mistake" in trying to obtain $250,000 as well as a $100,000 poker stipend from the casino.

Aside from Harrah's Entertainment, Greer also contacted MGM/Mirage and tried to obtain money through similar tactics. Specifically, Greer called Bruce Gebhardt, the Senior Vice President of Global Security at MGM/Mirage, and told Gebhardt the casino had a security leak that he could identify for a price. Greer sent a fax containing a sample of the information Greer possessed and told Gebhardt the "information was like a river, that he could just dip his hand into it and get it, get the information at any time." When Gebhardt accused Greer of extortion, Greer threatened to disclose the information to the newspapers so that the public would know MGM/Mirage failed to protect their customers' confidential information. Additionally, Greer also directed MGM/Mirage to the vulgar auction posting on eBay. Greer then demanded $250,000 from MGM/Mirage for identifying the source of the casino's security leak, but, before MGM/Mirage responded to this demand, the casino learned Greer had been arrested.

## C. *Greer's Cross-Examination*

After Greer's arrest, the government charged Greer with two counts of Attempted Interference with Commerce by Threats or Use of Fear (extortion) in violation of 18 U.S.C. § 1951, two counts of Wire Fraud in violation of 18 U.S.C. § 1343, and two counts of Use of Interstate Facility in Aid of Racketeering Activity (racketeering) in violation of 18 U.S.C. § 1952. At trial, Greer testified and, during his cross-examination, he made several denials which prompted the government to ask on approximately eight occasions whether government witnesses testified to "incorrect" or "inaccurate" information and on one occasion whether Greer believed Wilks was "less than candid" on the witness stand. For example, the following questioning occurred:

> Q: I'm asking when Mr. Wilks testified that you had told him . . . you had access to Harrah's confidential information and could access it any time you wanted, if that's what you told Mr. Wilks in that call.

A:   I do not recall telling him I could access it any time I wanted and I doubt that I said that.

Q:   All right. Do you recall Mr. Wilks testifying in this court that you said that?

A:   Yes, sir, I do.

Q:   All right. So when Mr. Wilks said that, he was testifying as to incorrect or inaccurate information?

A:   I believe so, yes, sir.

. . .

Q:   Did you tell [Mr. Wilks you could obtain Harrah's confidential information any time you wanted and it only took two minutes for you to do so]?

A:   No, sir.

Q:   All right. So when Mr. Wilks testified to that here in this courtroom, he was testifying as to inaccurate information?

A:   I believe he was lying, sir.

. . .

Q:   All right. You heard Mr. Riley testify here that you said that you had access to all of the company employees' information for the Las Vegas region and New Orleans region?

A:   Yes, sir, I did.

Q:   And you're saying you did not tell him that?

A:   . . . I did not tell him [that], no, sir.

Q:   All right. So when Mr. Riley made that state-ment here . . . he testified to inaccurate information?

A:   At the most charitable interpretation, yes, sir.

. . .

Q:   [D]o you remember Mr. Wilks testifying . . . that you ever said to him that if he felt that you were . . . extorting him, that you would never have any contact with him?

A:   No, sir, I don't recall him testifying to that effect, I do not.

Q:   Well, you seem to be indicating that you think that Mr. Wilks was less than candid?

A:   That would be a fair characterization, sir. Less than candid, that's a good way to put that. Not the way I would have chosen, but that's a good one.

Q:   Do you recall telling Mr. Wilks that you would trash the information if you didn't reach a deal, but you could always get more information and then you would have to decide what you would do with it?

A:   No, sir.

Q:   Do you recall Mr. Wilks testifying that's what you said?

A:   Yes, sir, I do.

Q:   So, if Mr. Wilks testified to that here in the courtroom, he was testifying as to inaccurate infor-mation?

A:  Let's go with your less than candid construc-
tion. I think he was telling a bald faced lie.

Although Greer eventually raised an "asked and answered"
objection to these questions, Greer never objected that these
questions were otherwise improper. Additionally, when Greer
made his "asked and answered" objection, the prosecutor
replied: "I'm getting, you know, references to lying. I really
just want him to say that Mr. Wilks'[s] testimony was inaccu-
rate as to the testimony."

D.  *The Jury Instructions*

At the conclusion of Greer's trial, the district court gave
three jury instructions that are relevant to this appeal. First,
the district court gave a specific instruction expounding the
elements of extortion:

In order for the defendant Jeffrey Greer to be found
guilty of . . . extortion, the government must prove
each of the following elements beyond a reasonable
doubt: First, the defendant attempted to induce Har-
rah's Entertainment or MGM/Mirage to part with
money or property by the wrongful use of fear of
economic harm to Harrah's Entertainment or
MGM/Mirage; Second, the Defendant acted with the
intent to obtain money from Harrah's Entertainment
or MGM/Mirage that *the defendant knew he was not
entitled to receive*; Third, commerce from one state
to another would have been delayed, obstructed or
affected in any way or degree; Fourth, the defendant
did something that was a substantial step toward
committing the crime of extortion by threat of eco-
nomic harm, with all of you agreeing as to what con-
stituted a substantial step.

Second, the district court proffered a general "knowingly"
instruction stating that "[a]n act is done knowingly if the

defendant is aware of the act and does not act through igno-rance, mistake, or accident. *The government is not required to prove that the defendant knew that his actions were unlaw-ful*." And third, in response to the jury's asking what "wrong-ful" meant in the phrase "wrongful use of fear of economic harm," the district court instructed the jury that "[t]he wrong-ful use of fear means that the defendant had no lawful right to obtain the money in that way."

Prior to charging the jury, Greer partially objected to the specific instruction expounding the elements of extortion, requesting that the district court further define the term "wrongful" to mean "that the defendant has no lawful claim to the property [that was left in his truck]."[2] The district court refused to give this instruction because, in its view, Greer's proposed definition was an incorrect statement of the law.[3] Greer also objected to the district court's "wrongful" instruction—given in response to the jury's asking what "wrongful" meant—arguing that the district court should use the definition Greer previously proffered; the district court overruled the defendant's objection. Greer, however, never objected to the jury instructions on the grounds that the gen-

[2]Greer had a much more innocent explanation for how he obtained the documents (they were left in his truck) than for how he used the docu-ments to obtain the casinos' money (threatening the casinos). Greer's prof-fered definition of "wrongful" clearly intended to shift the jury's inquiry away from how Greer used the documents to threaten the casinos to how he acquired the documents in the first place.

[3]The Hobbs Act defines extortion as "the obtaining of property from another . . . by *wrongful* use of actual or threatened . . . fear." 18 U.S.C. § 1951 (emphasis added). The district court was correct to instruct the jury that "wrongful" refers to the property Greer tried to obtain—the casinos' money—rather than to the property Greer used to obtain money from the casinos—the documents left in his truck. As the Supreme Court explained, " 'wrongful' has meaning in the [Hobbs] Act only if it limits the statute's coverage to those instances where *the obtaining of the property* would itself be 'wrongful' because the alleged extortionist has *no lawful claim to that property*." *United States v. Enmons*, 410 U.S. 396, 399-400 (1973) (emphasis added).

eral "knowingly" instruction conflicted with the specific extortion instruction.

### E.  *Greer's Conviction and Subsequent Appeal*

The jury convicted Greer of extortion and racketeering, but acquitted him of wire fraud. On appeal, Greer now argues his convictions should be reversed for two reasons. First, Greer argues the district court failed to give a specific intent instruction and then proffered conflicting jury instructions that negated a mens rea element of extortion. Specifically, Greer claims the general "knowingly" instruction informing the jury that "[t]he government is not required to prove that *the defendant knew that his actions were unlawful*" negated the specific instruction requiring the jury to find that Greer "acted with the intent to obtain money from [the casinos] *that [Greer] knew he was not entitled to receive*." Second, Greer argues the prosecutor improperly asked him to comment on the government witnesses' credibility.

## STANDARD OF REVIEW

**[1]**  Because Greer never asked for a specific intent instruction and failed to object at trial either that the district court proffered conflicting jury instructions or that the prosecutor improperly asked Greer to comment on the veracity of government witnesses, we review Greer's arguments under the plain error standard. *See United States v. Lopez-Cavasos*, 915 F.2d 474, 475 (9th Cir. 1990). "Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights. If these three conditions . . . are met, [we] may exercise [our] discretion to notice a forfeited error that (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc) (internal citations and quotation marks omitted).

DISCUSSION

A.   *Extortion Jury Instructions*

The Hobbs Act, 18 U.S.C. § 1951, states in relevant part:

(a) Whoever in any way or degree . . . affects commerce or the movement of any article . . . in commerce, by . . . extortion or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both.

(b) As used in this section

. . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Greer makes two arguments. First, he argues that the term "wrongful" in § 1951 requires that the government prove he acted with the specific intent to violate the law. Second, he argues that the district court's various instructions conflicted and eliminated a mental state requirement for conviction—specifically, the defendant's subjective knowledge "that he had no legitimate claim to the property or money in question." We address each argument in turn.

1.   Specific Intent to Violate the Law

**[2]** Citing *United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989), Greer argues that § 1951 requires proof of "specific intent to violate the law." Greer has misread *Sturm*.

**[3]** In *Sturm*, the First Circuit held that "the term 'wrongful' [in 18 U.S.C. § 1951] requires the government to prove,

in cases involving extortion based on economic fear, that *the defendant knew . . . he was not legally entitled to the property that he [tried to obtain].*" *Sturm*, 870 F.2d at 774 (emphasis added). *Sturm*, however, never held the defendant must know his actions violate the law. Indeed, the First Circuit explicitly refused to "express any opinion about whether extortion under the Hobbs Act requires the 'evil motive' version of specific intent," *id.* at 777, "manifested by a deliberate intention to disobey a statute." *Id.* at 776. Greer is thus wrong to assert that the crime of economic extortion is "one of the rare instances where ignorance of the law is in fact a defense" when, by "ignorance of the law," Greer refers to the defendant's knowledge of the Hobbs Act. The First Circuit distinguished between ignorance of "the [criminal] law defining the offense" and ignorance of "the [non-criminal] law characterizing attendant circumstances that are material to the offense." *Id.* It held only that the latter type of ignorance—in *Sturm*, "ignoran[ce] of the law establishing the rights of debtors and creditors"—was a defense to an economic extortion prosecution. *Id.* Here, the district court satisfied *Sturm* because it instructed the jury that the government must prove Greer "acted with the intent to obtain money from [the casinos] that [Greer] *knew he was not entitled to receive.*"

**[4]** So far as we can determine, no circuit has held that a specific intent instruction (i.e., specific intent to violate the law) is required and at least one circuit has held that it is not. *See United States v. Carmichael*, 232 F.3d 510, 522 (6th Cir. 2000) ("To the extent [the defendant] is arguing that the district court was required to instruct the jury that, in order to convict [him], it had to conclude [he] intended to violate the Hobbs Act, we reject the argument as unsupported by the law."). Although we see no justification for concluding that "wrongful" in § 1951 requires proof of specific intent to violate the law, we are hesitant to hold so in this case, especially since Greer's contrary argument relies only on a misreading of *Sturm*. But at the very least, it was not plain error for the district court to fail to give such a specific intent instruction.

*See United States v. Turman*, 122 F.3d 1167, 1171 (9th Cir. 1997) (finding no plain error where "[a]t the time defendant was tried, no circuit . . . had considered the validity of his [jury] instructions, nor was the error so obvious that the district judge should have recognized it on her own").

2.   Conflicting Jury Instructions

**[5]** Greer acknowledges that the district court's extortion instruction—requiring the government to prove Greer "acted with the intent to obtain money from [the casinos] *that [Greer] knew he was not entitled to receive*" —"could conceivabl[y] encompass" the First Circuit's requirement in *Sturm*. Nevertheless, Greer advances a second argument—that the district court issued contrary instructions. Greer argues that the district court's subsequent definition of "knowingly" —stating that "[t]he government is not required to prove *that the defendant knew . . . his actions were unlawful*" — conflicted with the extortion instruction and essentially eliminated the requirement that "*[Greer know] he was not entitled to receive*" money from the casinos. We hold the district court did not give conflicting instructions.[4]

We encountered a similar argument in *United States v. Gravenmeir*, 121 F.3d 526 (9th Cir. 1997), where the defendant was charged with, among other things, possessing a machine gun in violation of 18 U.S.C. § 922(o). There, the judge instructed the jury that the government must prove "the defendant knew that the firearm [he possessed] was a machine

----

[4]Because the district court's instructions satisfied the First Circuit's requirement in *Sturm*, we need not decide whether to adopt *Sturm* as the law of this circuit. *See United States v. Dischner*, 974 F.2d 1502, 1515 (9th Cir. 1992) (refusing to "decide whether the government must prove that the defendant knew he had no entitlement" to the property he tried to obtain where the jury instructions "read as a whole . . . necessarily required a finding that [the defendant] knew he had no right to the payments induced"), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) (en banc).

gun," but, shortly thereafter, also told the jury "[t]he government is not required to prove that the defendant knew that his acts . . . were unlawful." *Gravenmeir*, 121 F.3d at 529-30. On appeal, the defendant argued the two instructions conflicted because "the jury, applying the general ['knowingly'] instruction, could have convicted him without finding that he knew of the automatic capability of the Uzi." *Id.* at 530. We rejected this argument because we could not see "how a jury could avoid finding that [the defendant] 'knew that the firearm was a machine gun' because of a general instruction that requires a defendant's awareness of his acts." *Id.*

**[6]** Here, similarly, we fail to see how the district court's general "knowingly" instruction negates or even conflicts with the district court's specific extortion instruction. While these instructions are thematically similar—they both address the defendant's subjective knowledge—they are substantively different because they address two distinct types of subjective knowledge. The general "knowingly" instruction addresses *knowledge of unlawful activity*. Specifically, this instruction reaffirms "the rule that ignorance of the law is no excuse" by clarifying that knowledge of an *act* "does not include knowledge of the *law*." *United States v. Sherbondy,* 865 F.2d 996, 1002 (9th Cir. 1988) (emphasis added); *see also United States v. Obiechie*, 38 F.3d 309, 315 (7th Cir. 1994) (stating that " 'knowingly' . . . refers only to the intent to do the act that is proscribed by law, as opposed to the intentional violation of a known legal duty"). Thus, the district court properly instructed the jury that "[a]n act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his actions were unlawful."

**[7]** By contrast, the district court's extortion instruction addresses *knowledge of legal entitlement* to the property the alleged extortionist tried to obtain. Specifically, this instruction seeks to prevent the jury from concluding "that it could

find [Greer] guilty of attempted extortion even if [the jury] found credible [Greer's] claim that he sincerely believed . . . he was legally entitled to [money from the casinos]." *Sturm*, 870 F.2d at 775 (1st Cir. 1989). Thus, the district court advised the jury, consistent with *Sturm*, that the government must prove "the Defendant acted with the intent to obtain money from Harrah's Entertainment or MGM/Mirage that *the defendant knew he was not entitled to receive*." But whether Greer sincerely believed he was entitled to obtain money from the casinos tells us nothing about whether Greer also had to know that his underlying acts violated the Hobbs Act. Because the general "knowingly" instruction addresses only this latter type of knowledge—clarifying that the prosecution did not have to prove Greer knew his acts violated the *law*, but only that Greer's criminal *acts* were done intentionally—it could not modify the extortion instruction.

Our analysis in *United States v. Stein*, 37 F.3d 1407 (9th Cir. 1994), helps clarify why the general "knowingly" instruction in Greer's case was not error. In *Stein*, the defendant was charged with money laundering as well as various acts of fraud that produced the laundered proceeds. *Stein*, 37 F.3d at 1408. On appeal, the defendant then argued that "part of the district court's instructions . . . on the money laundering counts were negated by a general instruction on when an act is done 'knowingly.' " *Id.* at 1409. Specifically, the defendant claimed that the money laundering instruction—requiring the government to "prove . . . the defendant *knew the property [laundered] represented the proceeds of [unlawful activity]*" —conflicted with the general "knowingly" instruction, which did not require the government to prove the defendant "*knew that his acts . . . were unlawful*."[5] *Id.* at 1410 (emphasis

---

[5]The money laundering statute itself requires the government to prove the defendant knew the laundered money came from an unlawful activity:

Whoever, *knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity*,

added). As we explained, "[a] distinction must be drawn between the two types of knowledge implicated by the money laundering statute. While to sustain a conviction the defendant must have known that the primary predicate activity . . . was unlawful, he need not have known that the secondary act of laundering the proceeds was unlawful." *Id.* (citations omitted). We then held the two instructions conflicted because "th[e] general ['knowingly'] instruction . . . purport[ed] to apply to all of the defendant's actions—his predicate acts of fraud as well as his secondary act of money laundering." *Id.* Accordingly, "by applying the later general instruction, a jury could convict [the defendant] without finding that he knew his predicate acts of fraud were unlawful." *Id.*

Because the money laundering statute explicitly requires that the defendant know of other unlawful activity, a money laundering instruction and a general "knowingly" instruction address the same type of knowledge: *knowledge of unlawful activity*. This substantive overlap between the two instructions was crucial to our finding in *Stein* that the instructions were in conflict. As we later explained, it was also crucial to our analysis that the defendant was charged with the underlying unlawful acts which produced the laundered proceeds: "The statement that 'the government is not required to prove that the defendant knew his acts were unlawful' conflicted with the knowledge requirement of the money-laundering statute *since the defendant's acts included the underlying act[s] of fraud.*" *United States v. Golb*, 69 F.3d 1417, 1428 (9th Cir. 1995) (emphasis added). Had the defendant not been charged with the underlying acts of fraud, "the general knowledge instruction could [have] applied [only to the defendant's

---

conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity, [is guilty of money laundering].

18 U.S.C. § 1956(a)(1)(A)(i) (emphasis added).

money laundering acts]" and would have thus been "a correct statement of the law." *Id.*

**[8]** By contrast, there is no similar substantive overlap between the district court's extortion instruction and the general "knowingly" instruction because the extortion instruction addresses a different type of knowledge: the defendant's *subjective knowledge that he was not entitled to the property* he tried to obtain.[6] Because knowing that one is not entitled to receive property does not mean that one thereby knows of unlawful activity, an instruction addressing only the latter type of knowledge cannot modify an instruction addressing the former. Relying on *United States v. Turman*, 122 F.3d 1167 (9th Cir. 1997), and *Stein*, the dissent argues that the district court plainly erred in this case because "this court has long 'settled the law' that a specific instruction on subjective knowledge of unlawfulness erroneously conflicts with a subsequent general 'knowingly' instruction." Dissent at 4622. However, the dissent's reliance on *Turman* and *Stein* is misplaced because these cases relate to the federal money laundering statute, 18 U.S.C. § 1957, which by its terms requires some knowledge of unlawful activity. As we have explained above, the extortion statute does not require knowledge of unlawful activity; though in cases of economic extortion it may require that the defendant know he was not legally entitled to the property he tried to obtain, knowledge of legal entitlement to property is not the same as knowledge of unlawful activity. The dissent simply assumes that these two types of knowledge are the same.

Greer again argues his case is similar to *United States v. Sturm,* where the First Circuit reversed an attempted extortion

---

[6]Indeed, the extortion statute merely requires that the defendant obtain property from another by "wrongful use of actual or threatened . . . fear." 18 U.S.C. § 1951(b)(2). Unlike the money laundering statute, the extortion statute contains no additional requirement that the defendant *know of other unlawful activity.*

conviction under the plain error standard because of erroneous jury instructions. *Sturm*, 870 F.2d at 776-77. There are some similarities between the jury instructions in *Sturm* and the jury instructions in this case, but in the end we think *Sturm* is distinguishable from Greer's case. In *Sturm*—as here—the trial court first instructed the jury that "wrongful, as in wrongful use of fear, means that the Defendant had no lawful right to the property he sought to obtain." *Id.* at 775 (alterations omitted). The trial court then provided a general "knowingly" instruction: "the government is not required to provide, however, evidence that the Defendant knew those intentional acts were themselves illegal. In this case, ignorance of the law is no excuse." *Id.* (alterations omitted). However, *Sturm* is ultimately inapposite because there "the trial court did not instruct the jury that . . . to convict the defendant . . . it would have to find that Sturm knew that he was not legally entitled to [the property he tried to obtain]." *Id.* Indeed, as the First Circuit explained, "[b]y making no reference to the defendant's state of mind, the [trial court's 'wrongful'] instruction suggested that Sturm's mens rea was irrelevant." *Id.* Moreover, the general "knowingly" instruction "exacerbated" this error because although the instruction "*may have referred to ignorance of the Hobbs Act itself*, . . . given the absence of any instruction on the defendant's subjective intent with respect to the element of wrongfulness, the jury may have concluded that it could find Sturm guilty of attempted extortion even if it found credible his claim *that he sincerely believed . . . he was legally entitled to [the property in question].*" *Id.* (emphasis added).

**[9]** Here, as we have pointed out, the district court provided an instruction similar to the one the First Circuit found missing in *Sturm*. It instructed the jury that, to convict, the jury had to determine Greer "acted with the intent to obtain money from [the casinos] *that the defendant knew he was not entitled to receive.*" Accordingly, the district court's general "knowingly" instruction could not exacerbate an error that did not exist. Indeed, given the district court's instruction on the

defendant's subjective intent, the general "knowingly" instruction could only "refer[ ] to ignorance of the Hobbs Act itself." *Sturm*, 870 F.2d at 775. The district court's instructions, read as a whole, "necessarily required a finding that [Greer] knew he had no right to [obtain money from the casinos]."[7] *Dischner*, 974 F.2d at 1515. We thus hold the district court did not proffer conflicting jury instructions in this case.

## B.   *Improper Cross-Examination*

Greer next argues that the prosecutor's conduct during Greer's cross examination constitutes reversible plain error because the prosecutor repeatedly asked Greer to comment on the veracity of government witnesses. We disagree and hold that, even assuming the district court erred by allowing the questioning Greer complains of, the error was not plain.

[10] Although we have repeatedly stated that a prosecutor may not ask the defendant to comment on the veracity of another witness, we have found improper prosecutorial questioning in only one particular context: when the prosecutor specifically asked the defendant whether another witness was *lying*. *See, e.g., United States v. Harrison*, 585 F.3d 1155, 1158 (9th Cir. 2009) (holding it was improper for the prosecutor to ask the defendant whether a government witness was

---

[7]"The requirement that the defendant know that he was not legally entitled to the property in question *stems from the [extortion] statute's use of the term 'wrongful.'* " *Sturm*, 870 F.2d at 775 (emphasis added). Here, the district court's "wrongful" definition, by itself, made no reference to what the defendant subjectively must know; a better definition would have informed the jury not only that the defendant had no claim of right to the casinos' money, but also that the defendant *knew* this. However, because a different instruction contained this missing element, the instructions as a whole satisfied the concerns the *Sturm* court identified. *See United States v. Dearing*, 504 F.3d 897, 903 (9th Cir. 2007) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are adequate to guide the jury's deliberation.") (citation omitted); *United States v. Ward*, 914 F.2d 1340, 1344 (9th Cir. 1990) ("The availability of a better instruction is not a ground for reversal.").

lying); *United States v. Combs*, 379 F.3d 564, 572 (9th Cir. 2004) (same); *United States v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002) (same); *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999) (same). Thus, our precedents clearly establish that it is improper for the prosecutor to ask the defendant if a witness was *lying*. But we have not yet addressed whether it is improper for the prosecutor to ask the defendant, as the prosecutor did in this case, if a witness testified inaccurately.[8] At least three circuits, however, have held that merely asking the defendant whether another witness was "mistaken" or "wrong" rather than "lying" is proper because of the significant distinction between these formulations. *See, e.g, United States v. Gaines*, 170 F.3d 72, 82 (1st Cir. 1999) (holding that it is proper to ask the defendant whether another witness was "wrong" because the defendant is "not required to choose between conceding the point or branding another witness as a liar"); *United States v. Gaind*, 31 F.3d 73, 77 (2nd Cir. 1994) ("Asking [the defendant] whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.' "); *see also United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (citing *Gaines* and *Gaind* approvingly for the proposition that "it is often necessary on cross-examination to focus [the defendant] on the differences and similarities between his testimony and that of another witness").

---

[8]On one occasion, the prosecutor asked Greer whether a government witness had been "less than candid" during his testimony. Because we see no difference between asking whether a witness was "lying" or being "less than candid," this question was improper. Nevertheless, this single improper question cannot constitute plain error because "the probability of a different result [absent this question] is [not] sufficient to undermine confidence in the outcome of the proceeding." *Ameline*, 409 F.3d at 1078 (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)); *see also Harrison*, 583 F.3d at 1159, 1163 (no plain error where the prosecutor asked at least twenty-six improper veracity-based questions).

**[11]** We need not decide today whether it was improper for the prosecutor to ask Greer if other government witnesses testified inaccurately because, even assuming the district court erred by allowing this questioning, the error was not "so clear-cut, so obvious, a competent district judge should [have] be[en] able to avoid it without benefit of objection." *Turman*, 122 F.3d at 1170. "When the state of the law is unclear at trial and only becomes clear as a result of later authority, the district court's error is perforce not plain; we expect district judges to be knowledgeable, not clairvoyant." *Id.* Because neither the Supreme Court nor this court has yet ruled on the propriety of the prosecutor's questions in this case, the district court did not plainly err.

## CONCLUSION

We hold the district court did not plainly err by failing to give a specific intent instruction, nor did it give conflicting jury instructions that negated a mental state requirement of extortion. We also hold the district court did not plainly err by allowing the prosecutor to ask Greer whether other government witnesses testified inaccurately. Accordingly, we affirm Greer's convictions for extortion and racketeering.

**AFFIRMED.**

---

PANNER, Senior District Judge, dissenting:

I respectfully dissent. The trial court instructed the jury that for Greer to be guilty of extortion it must find he "acted with the intent to obtain money from [the casinos] that [he] knew he was not entitled to receive." The court also instructed the jury that "[t]he government is not required to prove that the defendant knew that his actions were unlawful." In my opinion, these conflicting instructions amount to plain error. *See*

*United States v. Olano*, 507 U.S. 725, 732 (1993) (defining plain error).

The error is plain because this court has long "settled the law" that a specific instruction on subjective knowledge of unlawfulness erroneously conflicts with a subsequent general "knowingly" instruction. *United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir. 1997); *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994). Furthermore, the general instruction here did not make "sufficiently clear" which charges it applied to. *See United States v. Knapp*, 120 F.3d 928, 931-32 (9th Cir. 1997).

The majority apparently limits application of *Stein* and *Turman* to convictions under 18 U.S.C. § 1957 or convictions under statutes that similarly require a subjective knowledge of unlawfulness. I can only conclude, however, that instructions requiring a finding of subjective knowledge of unlawfulness plainly conflict with a general knowingly instruction, regardless of whether the subjective knowledge element is required by statute or, as here, by judge-made law. The majority apparently believes Greer could have known he was not legally entitled to the money but not know his actions were unlawful. I disagree.

Moreover, the supplemental definition of "wrongful," as used in the phrase "wrongful use of fear of economic harm," required only objective unlawfulness. This instruction, provided during deliberations at the jury's request, compounded the earlier error of conflicting general and specific jury instructions on the subjective mental element required for conviction on the extortion counts.

This is not a case where the error can be ignored because of overwhelming evidence of guilt. *See United States v. Ramirez*, 537 F.3d 1075, 1086 (9th Cir. 2008). Rather, the jury could have reasonably found that Greer did not know the unlawfulness of his actions.

The majority cites *United States v. Gravenmeir*, 121 F.3d 526 (9th Cir. 1997), but *Gravenmeir* is not on point. There, the defendant was convicted of possession of a machine gun, a crime which does not require the defendant subjectively know that possessing a machine gun was illegal. *Id.* at 529. The general knowledge instruction was therefore consistent with the instructions on the elements of the crime.

In contrast, here the jury could have found Greer guilty of extortion even if it did not find that Greer knew he was not entitled to receive money from the casinos. *See Stein*, 37 F.3d at 1410 ("Where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one."). The jury's request during deliberations for examples of "wrongful use of fear of economic harm" and for a supplemental instruction on "wrongful" suggests some confusion as to the mental element required for conviction.

Greer's extortion convictions should be reversed. Furthermore, his racketeering convictions should also be reversed because the jury returned a general verdict, making it uncertain whether the jury based its guilty findings for racketeering on its guilty findings for extortion. *See Hedgpeth v. Pulido*, 129 S. Ct. 530, 530-31 (2008) (per curiam) (explaining such a flaw in the instructions is error if it "had substantial and injurious effect or influence in determining the jury's verdict") (internal quotation marks omitted).