RAWLINSON, Circuit Judge,
dissenting:
I respectfully dissent. Martin Alcan-tara-Castillo (Alcantara) challenges his conviction for being a deported alien found in the United States in violation of 8 U.S.C. § 1326. Alcantara contends that a new trial is warranted because the government improperly compelled Alcantara to challenge the veracity of a government witness during the government’s cross-examination and impermissibly vouched for government witnesses during closing arguments. The majority agrees with Alcan-tara. I agree with the district court.

I. BACKGROUND

Alcantara was charged with one count of being a deported alien found in the United States in violation of 8 U.S.C. § 1326.
A. Trial Testimony
Border Patrol Agent Aaron Hunter testified that, on June 26, 2011, he was informed that a motion sensor had been *1199 triggered approximately seven miles east of the Tecate port of entry. Agent Hunter described the area as “very mountainous, rugged terrain” one mile north of the border.
According to Agent Hunter, he discovered Alcantara lying on the ground in the area, alongside a cargo container. When questioned in Spanish, Alcantara responded that he was a Mexican citizen and lacked any documents permitting him to be in the United States. Agent Hunter arrested Alcantara, who remainéd calm and submissive. Agent Hunter opined that, if Alcantara had been under the influence of narcotics,. Agent Hunter would have contacted the local police for safety reasons. Based on his training, Agent Hunter did not believe that Alcantara was under the influence of narcotics because Alcantara “seemed fully aware of the situation” and answered Agent Hunter’s questions appropriately.
According to Agent Hunter, Alcantara spontaneously informed Agent Hunter that he was part of a group of aliens who had been chased by border patrol agents during the previous night and that he was attempting to return to Mexico.
During a subsequent search, border patrol agents other than Agent Hunter found a backpack with empty bottles and food containers, but no illegal narcotics or drug paraphernalia. Agent Hunter related that Alcantara also provided a false name to the agents.
On cross-examination, Agent Hunter acknowledged that the arrest report did not include Alcantara’s statement that he had been separated from a group of aliens entering the Unitpd States. Agent Hunter also did not mention the statement to his fellow agent, or when he drafted an addendum to the report. Agent Hunter informed the government of Alcantara’s statement when preparing for trial. Agent Hunter explained that the statement was not in the report or addendum because it was “not relevant to the arrest.” Rather, the facts relevant to Alcantara’s arrest were Alcantara’s presence in the United States; his statement that he was a Mexican citizen; and the lack of documents permitting Alcantara to enter or remain in the United States.
Border Patrol Agent Luis Martinez testified that, on June 26, 2011, he interviewed Alcantara. Agent Martinez terminated the interview within one minute pursuant to Border Patrol policies because Alcantara stated that he was under the influence of methamphetamine. However, Agent Martinez related that, based on his training, there were no objective indications that Alcantara was under the influence of “any mind-altering substance.”
According to Alcantara, he had been using methamphetamine almost daily since 1995. He decided to enter a rehabilitation clinic on June 24, 2011, the day before his arrest in the United States, because one of his friends had died of an overdose. Intending to enter a clinic near El Hongo, Mexico, he left on a bus to Tecate on June 25, but purchased methamphetamine prior to leaving. After arriving in Tecate, Al-cantara intended to go to the home of a friend. However, Alcantara met two men along the way in a tunnel near a bridge and smoked methamphetamine with them, more methamphetamine than he had ever smoked before.
Alcantara did not remember leaving the tunnel, and awakened the next day on the side of the road, thinking he was on the road between Tecate and Mexicali. According to Alcantara, he was resting on a board next to a container when he was approached by an individual in a uniform. Alcantara informed the man in uniform that he was Mexican. Alcantara did not remember saying anything more to the man.
*1200 Alcantara acknowledged that he had been convicted of illegal reentry in 1995, 1997, 2002, and 2009. Alcantara also conceded that he had lied during a prior arrest when he stated that he had never used methamphetamine.
The prosecutor asked Alcantara if he remembered Agent Hunter’s testimony from the previous day concerning statements made by Alcantara. Alcantara stated that he did not remember Agent Hunter’s testimony. Alcantara also responded:
Agent Hunter, he can say whatever he wants. He is saying I had a black sweater the day of my arrest, that I had food in my backpack, and there is nothing of that. That was all invented. All these things were invented.
The prosecutor subsequently inquired, “Your testimony is that Agent Hunter is inventing stories about you; is that correct?” When Alcantara responded, “[w]here are my things,” the prosecutor asked, “do you remember him telling that story?” After overruling the defense’s objection that the government was vouching for Agent Hunter, the district court stated there was “a confusion as to time. Did you hear the story the agent told yesterday?” Alcantara finally responded, “Yes, I did.”
Dr. Clark Smith, a specialist in psychiatry and addiction psychiatry, testified that he interviewed Alcantara for three hours and determined that Alcantara was methamphetamine-dependent.
Lorena Garcia (Garcia), an investigator for the Federal Defenders of San Diego, traveled to Mexico and visited the rehabilitation clinic in El Hongo. Garcia related that the clinic went by the acronym “CRREAD” and that it was located to the east of Tecate. Garcia also located a tunnel “on the outskirts of Tecate ...”
B. Closing Arguments
During closing arguments, the prosecutor stated:
Credibility. This case is largely going to come down to the issue of credibility. You have heard two versions of the facts in this case. Two witnesses: the defendant testifying that he didn’t know what happened, that he was blacked out; and the prosecution’s witness, Border Patrol Agent Aaron Hunter, who testified that the defendant calmly and coherently told him how he had knowingly entered the United States the day before, and proceeded north with a group that had been scouted by ... border patrol agents on ATVs.
The prosecutor argued that the jury could not believe both Agent Hunter’s testimony and Alcantara’s testimony and “one of those two witnesses is not telling the truth.” Relying on the credibility instruction provided by the district court,[1] the prosecutor asserted that “Agent Hunter’s testimony remained consistent. It remained believable, and it remained logical.”
*1201 The prosecutor emphasized that Alcan-tara remembered numerous events, such as smoking methamphetamine, resting at the container, and picking up a water bottle on the roadside, but was unable to remember key facts concerning his entry into the United States. The prosecutor argued that Alcantara was not credible and had “every motive to lie ... ”
In rebuttal, the prosecutor reiterated that “this case boils down to the credibility of a 15-year methamphetamine addict, a man who has every incentive to lie, versus the testimony and the evidence of border patrol agents who are sworn to uphold the law.” The district court sustained the defense’s objection and instructed the jury to disregard the government’s comment. However, the district court denied the defense’s request for a curative instruction that “law enforcement officers are not entitled to any greater credibility as compared to any other witness.... ” The district court held that the jury had been thoroughly instructed on the credibility of witnesses and that a curative instruction was unwarranted in light of the district court’s instruction for the jury to disregard the comment.
C. Conviction and Sentence
The jury found Alcantara guilty and the district court sentenced Alcantara to forty months’ imprisonment. Alcantara filed a timely notice of appeal.

II. STANDARDS OF REVIEW

“We review alleged vouching for harmless error when ... the defendant objected at trial.” United States v. Stinson, 647 F.3d 1196, 1211 (9th Cir.2011), as amended (citation omitted). “We review for abuse of discretion a district court’s rulings on alleged prosecutorial misconduct, including vouching.” Id. (citation omitted). We review claims of misconduct for plain error when the defendant failed to object. See United States v. Doss, 630 F.3d 1181, 1193 (9th Cir.2011), as amended. Denial of a requested curative instruction is reviewed for abuse of discretion. See United States v. Skinner, 667 F.2d 1306, 1310 (9th Cir.1982).

III. DISCUSSION

A. The Prosecutor’s Cross-Examination
Because Alcantara did not object to the cross-examination during trial, we review for plain error. See Doss, 630 F.3d at 1193. To be plain, an error must be so obvious that the judge should be able to detect the error even in the absence of an objection. See United States v. Matus-Zayas, 655 F.3d 1092, 1098 (9th Cir.2011). “Improper questioning was [not] an organizational theme for the prosecutor’s entire cross-examination.” United States v. Harrison, 585 F.3d 1155, 1159 (9th Cir.2009), as amended. Rather, Alcantara spontaneously challenged Agent Hunter’s testimony when the prosecutor merely inquired whether Alcantara remembered that testimony. The prosecutor followed up by inquiring if it was Alcantara’s “testimony ... that Agent Hunter [was] inventing stories about [him].” The prosecutor did not otherwise compel Alcantara to comment on Agent Hunter’s veracity. Cf. United States v. Geston, 299 F.3d 1130, 1135 (9th Cir.2002) (asking five times whether the government witness “would be lying” if his testimony contradicted that of the witness).
The crucial distinction between this case and the cases cited in the majority opinion is the absence of the word “lying” in the questions posed by the prosecutor in this case. Use of that word appears to be the common denominator in those cases holding that plain error occurred. See, e.g., Geston, 299 F.3d at 1134 (asking if the government witness “would be lying”)-, United States v. Combs, 379 F.3d 564, 572 *1202 (9th Cir.2004) (questioning whether agent “was lying” in his. earlier testimony); Harrison, 585 F.3d at 1158 (inquiring if witnesses were “swearing on oath to testify to the truth and then lying ”); United States v. Sanchez, 176 F.3d 1214, 1220 (9th Cir.1999) (asking if the witness “would say [another witness] was lying ” when he testified); United States v. Moreland, 622 F.3d 1147, 1159 (9th Cir.2010) (“You heard his testimony.... He’s lying 1”) (emphases added).
The majority seeks to lessen the prece-dential effect of these cases by resorting to dictionary definitions. See Majority Opinion, pp. 1192-93. Yet, we resort to dictionary definitions only when the meaning of language in a statute is unclear, not to reword our precedent. See, e.g., San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1035 (9th Cir.2004) (“To determine the plain meaning of a term undefined by a statute, resort to a dictionary is permissible ... ”) (citation omitted). The fact remains that the majority has cited no case where prosecutorial misconduct was found based on an inquiry regarding “invention” of testimony, particularly when that characterization was first used by the testifying defendant. Without clear precedent on this issue, it cannot be fairly said that the district court plainly erred.
Indeed, the majority has not cited one case where there was a determination of plain error in the absence of use of the word “lying” or some variant of “lie.” Yet, there are cases in our precedent concluding that there was no plain error when the prosecutor was accused of forcing the witness to comment on veracity, but stopped short of using the L-word. See, e.g., United States v. Greer, 640 F.3d 1011, 1023 (9th Cir.2011) (observing that “[a]lthough we have repeatedly stated that a prosecutor may not ask the defendant to comment on the veracity of another witness, we have found improper prosecutorial questioning in only one particular context: when the prosecutor specifically asked the defendant whether another witness was lying ”) (citing Harrison, Combs, Geston and Sanchez ).
The majority argues that my reliance on Greer is misplaced. See Majority Opinion, p. 1193. I beg to differ. Greer states definitively the point that makes plain error inapplicable to this case — “we have found improper prosecutorial questioning in only one particular context: when the prosecutor specifically asked the defendant whether another witness was lying.” 640 F.3d at 1023 (citations omitted) (emphasis in the original). We declined to conclude that there was plain error when the prosecutor asked whether another witness testified “inaccurately” because neither the Supreme Court nor our court had yet ruled on whether asking about “inaccurate” testimony was improper. Id. Similarly, neither the Supreme Court nor this court has ruled that asking about “invented” testimony is improper, particularly when the term is first used by the testifying defendant. Notably, Greer cites the exact cases cited by the majority, but acknowledges that these cases concluding that questioning was improper are limited to “one particular context: when the prosecutor specifically asked the defendant whether another witness was lying....” Id. (emphasis in the original); see also United States v. Wright, 625 F.3d 583, 612 (9th Cir.2010) (holding. that there was no plain error when the prosecutor asked the defendant questions concerning a “rogue agent” during “a fairly argumentative cross-examination in order to poke holes in [the defendant’s] version of the facts”).
The facts of this case diverge substantially from those relied upon by the majority. An initial and important difference is that the first comment on the veracity of *1203 Agent Hunter’s testimony came unprompted from Alcantara when he stated that Agent Hunter had “invented things” about Alcantara. Unlike in the cases where plain error occurred, the prosecutor did not follow up by asking Alcantara if Agent Hunter was lying when he testified. Rather, he used the same word utilized by Alcantara to ask Alcantara: “Your testimony is that Agent Hunter is inventing stories about you; is that correct?”
There was nothing inappropriate about the prosecutor asking Alcantara if he heard Agent Hunter’s testimony, and the majority has cited no authority otherwise. Cf. Hoxsie v. Kerby, 108 F.3d 1239, 1244 (10th Cir.1997) (rejecting a claim of prosecutor misconduct where the attorney asked the defendant if he had heard the testimony); see also Wright, 625 F.3d at 612 (“There was nothing improper about the prosecutor’s” questions forcing the defendant to call the investigating agent a “rogue agent”).
The majority intimates that its holding of plain error is valid because the prosecutor “forced” Alcantara to comment on Agent Hunter’s truthfulness. Majority Opinion, pp. 1193-94. However, this contention lacks persuasive force because we have expressly held that no plain error occurred during a “fairly argumentative cross-examination” that forced a defendant to call an agent a “rogue agent.” Wright, 625 F.3d at 612.
Finally, even if it was error for the district court to allow the prosecutor to follow-up on Alcantara’s comment that Agent Hunter “made up things,” “the error was not so clear-cut, so obvious, a competent district judge should have been able to avoid it without benefit of objection. ...” Greer, 640 F.3d at 1023 (citation, alterations and internal quotation marks omitted). In Greer, we concluded that “[bjecause neither the Supreme Court nor this court has yet ruled on the propriety of
the prosecutor’s questions in this case [whether witnesses testified inaccurately], the district court did not err.” Id. The same is true in this case. As mentioned, we have limited our cases involving plain error to those where a witness is asked if another witness is lying. See id. Neither the United States Supreme Court nor this court has gone further to impute plain error when the prosecutor asks if another witness “made úp things,” especially when the defendant used the phrase first and the prosecutor merely repeated the phrase in the form of a question. Because the facts in this ease differ so dramatically from those where plain error occurred, I would hold that the trial judge was not obligated to sua sponte object .to the prosecutor’s questions to Alcantara. See Matus-Zayas, 655 F.3d at 1098.
B. The Prosecutor’s Closing Arguments
“Improper vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness’s veracity, or suggesting that information not presented to the jury supports the witness’s testimony....” United States v. Ruiz, 710 F.3d 1077, 1085 (9th Cir.2013) (citation and internal quotation marks omitted). “[C]redibility is a matter to be decided by the jury.” Id. at 1082 (citation omitted). “To that end, prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents . must be lying.” Id. at 1082-83 (citation and internal quotation marks omitted). “It is also true, however, that the prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence. In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to *1204 argue, that one of the two sides is lying.” Id. (citations omitted).
Reversal of Alcantara’s conviction based on the prosecutor’s closing arguments is not warranted given Alcantara’s credibility problems and the evidence presented at trial. Alcantara was found in the United States in an area described as “very mountainous, rugged terrain” north of the United States-Mexico border. The government presented photographs to the jury evincing the rugged and mountainous terrain through which Alcantara maintained that he blindly and unconsciously wandered as he was under the influence of methamphetamine. Despite Alcantara’s contention that he was engaged in methamphetamine-induced wandering, Agent Hunter testified that border patrol agents found empty food containers and bottles in Alcantara’s backpack and that Alcantara did not appear to be under the influence of narcotics. Alcantara’s alleged statement to Agent Hunter that Alcantara was separated from a group of aliens traveling to the United States after being dispersed by border patrol agents was consistent with Agent Joseph Moore’s testimony concerning similar events that occurred that evening.
Alcantara also suffered from an extensively selective memory. He testified in great detail about his decision to enter a rehabilitation clinic on the day before his arrest; the one thousand pesos he won at a casino “on Revolución and Third Street” after purchasing a fifty-peso ticket he used to buy six balloons of methamphetamine on the night before making his decision to seek rehabilitation; his purchase of five bags of methamphetamine at the Hotel Nizan on the same evening; his bus trip at five o’clock in the morning on June 25th to Tecate; his purchase of two bags of methamphetamine immediately before his bus trip; his arrival in Tecate at eight o’clock in the morning; his cab ride to “the Anda-lucia neighborhood” to meet a friend, Juan, who had a small home near Tecate with sheep; his consumption of two balloons of methamphetamine with two men in a tunnel near a bridge and railroad tracks; and his subsequent methamphetamine purchase for seven hundred pesos. After waking up the next day in the United States, Alcantara remembered seeing “a small little farm that had some palm trees”; picking up a water bottle from the side of the road; cleaning a board on the ground next to a container so that he could rest; being approached by an individual “dressed in green”; asking Agent Hunter for water because Alcantara had filled his water bottle “over ... where the palm trees were at, and the water was dirty”; and picking up a water bottle as he was walking with Agent Hunter.
Despite Alcantara’s detailed recollection of the former events, Alcantara did not remember traveling through a rugged and mountainous area into the United States, any statement to Agent Hunter about his entry into the United States, or even Agent Hunter’s trial testimony from the day before until finally answering the district court’s question.
Moreover, Alcantara’s credibility was severely undermined by his admissions that he had been convicted of illegal reentry in 1995, 1997, 2002, and 2009. Notably, Al-cantara was arrested for illegal reentry on two occasions after traveling into the United States from Tecate. Alcantara also conceded that he lied during a prior arrest when he falsely stated that he had never used methamphetamine.
Although the prosecutor did improperly vouch for government witnesses by mentioning during rebuttal argument that the border patrol agents were “sworn to uphold the law,” the district court immediately sustained the defense attorney’s objection, and instructed the jury to disregard *1205 the comment, rendering any error harmless. See United States v. Parks, 285 F.3d 1133, 1141 (9th Cir.2002) (holding that improper statement was rendered harmless because the district court “sustained [the defendant’s] objection ... and admonished the jury to disregard the statement”). The district court did not abuse its discretion in denying Alcantara’s request for a curative instruction, as the district court properly held that the jury had been fully instructed concerning the credibility of government witnesses, and its prompt instruction to disregard the isolated comment sufficiently remedied any error. See United States v. Dorsey, 677 F.3d 944, 955 (9th Cir.2012) (holding that the district court’s swift response instructing the jury to disregard the improper comment “prevented ... [the] improper comment from materially affecting the verdict”) (citation omitted); see also United States v. Washington, 462 F.3d 1124, 1136 (9th Cir.2006) (“A judge’s prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments....”) (citations omitted).
Considering Alcantara’s significant credibility problems, the evidence presented at trial of his illegal presences in the United States, and. the curative instruction given by the trial judge, Alcantara failed to demonstrate that “in the context of the entire trial, it is more probable than not that [the prosecutor’s comment] materially affected the verdict....” Dorsey, 677 F.3d at 954 (citation and internal quotation marks omitted). Stated another way, any error in vouching for the witnesses was harmless. See id. at 955. Finally, there was no abuse of discretion in denying the requested curative instruction. See Skinner, 667 F.2d at 1310 (recognizing that use of curative or limiting instructions is within the district court’s discretion).
Our decision in United States v. Weatherspoon, 410 F.3d 1142 (9th Cir.2005), does not compel a contrary result. In that case, the prosecutor extensively vouched for government witnesses. The prosecutor started out by describing a police witness as “a credible officer.” Id. at 1146. Despite being instructed not to vouch, the prosecutor went on to argue that the police officers
had no reason to come in here and not tell you the truth. I guess, if you believe ... defense counsel, they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me; they lied to my agent ... I guess they lied to the dispatcher when they called it in. These are officers that risk losin’ [sic] their jobs, risk losin’ [sic] their pension, risk losin’ [sic] their livelihood. And, on top of that if they come in here and lie, I guess they’re riskin’ bein’ [sic] prosecuted for perjury....

Id.

The prosecutor used the “they lied” refrain six consecutive times, and told the jury that the officers risked losing their jobs, losing their pensions, losing their livelihood, and being prosecuted for perjury. Id. In contrast, the prosecutor in this case simply stated once that the agent was sworn to uphold the law. Unlike in Weatherspoon, see id., the prosecutor in this case did not continue to vouch for the agent after the court sustained the defense objection. Moreover, unlike in Weather-spoon, see id., the court in this case gave a curative instruction. The two cases are so different that Weatherspoon does not dictate the result in this case. In Weather-spoon, we held that reversal of the defendant’s conviction was warranted because the district court’s approach
did not produce any meaningful alteration of the prosecutor’s arguments, and *1206 the manner in which such objections were sustained unfortunately did not deliver the required strong cautionary message ...
Id. at 1151. We opined that
[s]uch failures to correct the improper statements at the time they were made cannot be salvaged by the later generalized jury instruction reminding jurors that a lawyer’s statements during closing argument do not constitute evidence. In short, the curative instructions offered ... did not neutralize the harm of the improper statements because they did not mention the specific statements of the prosecutor and were not given immediately after the damage was done.
Id. (citations, alteration, and internal quotation marks omitted). The district court in this case immediately sustained the defense’s objection and instructed the jury to disregard the isolated comment. Unlike in Weatherspoon, Alcantara does not contend that the government continued to improperly vouch for government witnesses after the district court’s ruling. See Dorsey, 677 F.3d at 955 (noting that the judge’s curative action prevented any improper comment from “materially affecting the verdict”); see also Parks, 285 F.3d at 1141 (same).

IV. CONCLUSION

The prosecutor’s isolated question in response to Alcantara’s spontaneous challenge to Agent Hunter’s veracity during extensive cross-examination does not rise to the level of plain error as reflected in our precedent.
The district court did not abuse its discretion in denying a curative instruction during the prosecutor’s rebuttal argument, as it immediately granted Alcantara’s motion to strike and instructed the jury to disregard the prosecutor’s comment that the border patrol agents were “sworn to uphold the law.” Any prejudice stemming from the government’s comment was cured by the district court’s instruction and no additional curative instruction was required. In any event, in the context of the entire trial, it is highly unlikely that the prosecutor’s comment materially affected the verdict.
There is no such thing as a perfect trial, and district court judges are not held to that standard. See Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Considering the trial in its entirety, the proceedings were fundamentally fair, and on that basis we should affirm this conviction. See id.; see also United States v. Del Toro-Barboza, 673 F.3d 1136, 1150 (9th Cir.2012).

. The district court instructed the jury:
In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. In considering the testimony of any witness, you may take into account:- (1) the witness’s opportunity and ability to see or hear or know the things testified to; (2) the witness’s memory; (3) the witness’s manner while testifying; (4) the witness's interest in the outcome of the
case, if any; (5) the witness’s bias or prejudice, if any; (6) whether other evidence contradicted the witness’s testimony; (7) the reasonableness of the witness’s testimony in light of all the evidence; and (8) any other factors that bear on believability. The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.