# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　　v.

REX T. HARRISON,
　　　　　　*Defendant-Appellant.*

No. 08-10391

D.C. No.
1:07-CR-00384-
DAE-1

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Hawaii
David A. Ezra, District Judge, Presiding

Argued and Submitted
May 13, 2009—Honolulu, Hawaii

Filed August 19, 2009
Amended October 9, 2009

Before: Alex Kozinski, Chief Judge, Jay S. Bybee and
Consuelo M. Callahan, Circuit Judges.

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Bybee

14403

## COUNSEL

Edward H. Kubo, Jr., United States Attorney; Lawrence L. Tong, Assistant United States Attorney, Honolulu, Hawaii for plaintiff-appellee the United States of America.

Peter C. Wolff, Jr., Office of the Federal Public Defender, Honolulu, Hawaii for defendant-appellant Rex T. Harrison.

## ORDER

The opinion is amended to replace the first two sentences of the first full paragraph on page 11321 of the slip opinion with the following:

<Although the evidence under count 2 would have been sufficient to support the jury's verdict, had the jury been properly instructed, it was ambiguous. Officer Kirby testified that she would not have ordered her dog to attack "without [Harrison] saying that he was going to do something to me," but she also said she was "not a hundred percent confident that he said he was going to attack me." And while at times Officer Kirby said that Harrison "started running" in her direction, at other times she said he merely "looked like he was starting to come running." >

Appellant's Petition for Rehearing and for Rehearing En Banc is otherwise denied. *See* Fed. R. App. P. 35, 40. Judge Bybee would grant the petition.

No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

KOZINSKI, Chief Judge:

Everyone could have done more to protect defendant's rights at trial.

## I

This is a tale of two Rex Harrisons. The first is the Harrison of Officers Jenkins and Kirby, two military police officers, who describe a man so drunk he could barely stand straight. A man who reeked of alcohol at a distance of six feet. Who snarled, "I don't think I should have to give you shit" when asked for his driver's license. A man who punched Officer Jenkins in the face and told Officer Kirby, "I'm not afraid of you and I'm not afraid of your fucking dog."

The second Rex Harrison is the man of his own telling. This Harrison had only "a couple of beers with dinner." When confronted by the officers, he humbly apologized for trespassing. This Harrison was calm and non-confrontational; he had the milk of human kindness by the quart in every vein. He certainly never hit anyone.

The jury must have believed the first story because it convicted Harrison of two counts of assaulting a federal officer. He appeals.

## II

Except where otherwise noted, Harrison's trial lawyer failed to object to the errors his new lawyer raises on appeal. We therefore review for plain error, asking the usual questions, including whether there was prejudice. *See, e.g.*, *United States* v. *Recio*, 371 F.3d 1093, 1100 (9th Cir. 2004).

**Count 1**

**A.** Harrison was convicted of assaulting Officer Jenkins and inflicting "bodily injury." 18 U.S.C. § 111(b). He complains that the prosecutors engaged in improper questioning during cross-examination and improper "vouching" during closing arguments.

**[1]** It's black letter law that a prosecutor may not ask a defendant to comment on the truthfulness of another witness, *United States* v. *Combs*, 379 F.3d 564, 572 (9th Cir. 2004), *United States* v. *Geston*, 299 F.3d, 1130, 1136 (9th Cir. 2002), but the prosecutors here did just that. One prosecutor asked: "You're saying that [they're] going on the stand, swearing an oath to testify to the truth and then lying . . . ?" He even pitted his own credibility against Harrison's, asking, "So I'm in the conspiracy against you, is that right?" These were not isolated incidents: Improper questioning was an organizational theme for the prosecutor's entire cross-examination.

**[2]** The vouching was similarly patent. The government was entitled to rebut Harrison's suggestion that Officers Jenkins and Kirby were motivated to lie, but it crossed the line when one prosecutor mentioned during closing that the officers had been promoted "with no adverse action whatsoever" after an internal military investigation. This clearly "suggest[ed] that information not presented to the jury," but available to the investigators, supported the officers' testimony. *United States* v. *Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). And it would be hard to find a clearer case of "placing the prestige of the government behind a witness," *id.*, than the prosecutor's statement that the "[g]overnment stands behind" Officers Jenkins and Kirby.

The government concedes the impropriety of many of these statements, but points out that the prosecutors were Special Assistant United States Attorneys on loan from the military. That's no excuse at all; when the United States Attorney

endows lawyers with the powers of federal prosecutors, he has a responsibility to properly train and supervise them so as to avoid trampling defendants' rights. Indeed, everyone involved could have done better: The defense attorney should have objected as soon as he saw the prosecutors step out of line. And the respected and experienced district judge should not have tolerated this protracted exhibition of unprofessional conduct.

**[3]** Nevertheless, Harrison must also show prejudice, and he hasn't. Harrison insists the government's case was "not overwhelming, but consisted of no more than a credibility contest . . . ." But the government presented physical evidence of Harrison's guilt, including an injury to one of his knuckles. Harrison admitted making a spurious 911 stolen-car call when he knew full well his car was with the MPs. A state police officer who saw Harrison later that night testified to his extreme intoxication. And both the state police officer and a third MP testified that Harrison used profanity and struggled while being arrested. After four witnesses undermined Harrison's credibility, we cannot say the prosecutors' misconduct "affected the outcome of the district court proceedings." *United States* v. *Olano*, 507 U.S. 725, 734 (1993). Any prejudice from the vouching was also ameliorated by the judge's belated curative instruction. *See Combs*, 379 F.3d at 575.

Harrison relies on *Geston* and *Combs*, but they are not on point. *Combs* reduced to a pure credibility contest between a defendant and two witnesses. 379 F.3d at 573. In *Geston*, because a prior trial resulted in a hung jury, we inferred that the case was a close one and thought the prosecutor's misconduct might well have tipped the balance. 299 F.3d at 1136.

**[4] B.** Harrison claims the jury should not have been instructed that it could infer consciousness of guilt from his flight. Such an instruction is proper only if the evidence supports "a chain of unbroken inferences" from (1) defendant's behavior to flight; (2) flight to consciousness of guilt; (3) con-

sciousness of guilt to consciousness of guilt concerning the crime charged; and (4) consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *United States* v. *Dixon*, 201 F.3d 1223, 1232 (9th Cir. 2000). Courts consider "whether the defendant knew the police suspected him of a particular crime" and "whether the defendant fled immediately after the crime." *Id.* Harrison objected at trial, so we review for abuse of discretion. *United States* v. *Perkins*, 937 F.2d 1397, 1401 (9th Cir. 1991).

**[5]** With respect to count 1, all the necessary inferences were supported. Having struck an officer in the face, Harrison would have been aware that police suspected him of a crime. And Harrison surely did flee the scene. Harrison claims the chain of inferences was broken when he reported his car as stolen. But the jury could have inferred that he made a false report in an effort to set up an imaginary car thief as the fall-guy for his crimes. Nor can we say the instruction was invalid because the jury might have mistakenly thought it applied to Harrison's first attempt to run away, prior to striking Officer Jenkins. The instruction permitted the jury to draw a reasonable inference; it did not require an unreasonable one. No reasonable jury would have inferred that Harrison was conscious of guilt because he fled prior to committing the crime.

**[6] C.** Harrison suggests that the multiple errors at trial deprived him of his due process and fair trial rights and urges us to reverse under a "cumulative effects" theory. But the errors did not render the trial "fundamentally unfair." *Parle* v. *Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). The prosecutor's improper questioning only highlighted a credibility judgment that Harrison was himself asking the jury to make. And the prosecutor's vouching, when paired with a curative instruction, did not make the defense "far less persuasive than it might [otherwise] have been." *Id.* (quoting *Chambers* v. *Mississippi*, 410 U.S. 284, 294 (1973)).

**Count 2**

Harrison was also convicted of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with Officer Kirby. 18 U.S.C. § 111(a). Harrison challenges his conviction based on the same prosecutorial misconduct and an additional erroneous jury instruction.

**A.** The misconduct once again was not prejudicial. To be sure, because there were no witnesses other than Harrison and Officer Kirby, this part of the case did reduce to a credibility contest akin to *Geston* or *Combs*. But once the jury believed that Harrison struck Officer Jenkins, it was not going to believe Harrison when he claimed he was a perfect gentleman towards Officer Kirby.

**[7] B.** The district court told the jury it could convict if "the defendant intentionally used force in assaulting, resisting, or intimidating" Officer Kirby, and it clarified that "[t]here is use of force when one person intentionally physically . . . intimidates . . . another." That was plain error. While "a defendant may be convicted of violating section 111 if he . . . uses any force whatsoever against a federal officer," including a mere threat of force, *United States* v. *Sommerstedt*, 752 F.2d 1494, 1496 (9th Cir. 1985), the instruction here defined "force" out of the statute entirely by equating it with physical intimidation. As instructed, the jury could have convicted Harrison for no more than purposefully standing in a way that emphasized his size and strength. The instruction was likewise improper under *United States* v. *Chapman*, which clarified after Harrison's trial that section 111 always requires proof of an assault. 528 F.3d 1215, 1222 (9th Cir. 2008). Just as physical intimidation need not involve use of force, it will not always constitute assault.

**[8]** We cannot find the "strong and convincing evidence" of force or assault that might excuse this instruction under plain error review. *See United States* v. *Alferahin*, 433 F.3d

1148, 1158 (9th Cir. 2006). The government suggests that the jury's verdict on the third (state law) count of the indictment shows that it necessarily found the missing elements, but that count involved conduct at an entirely different time.

Although the evidence under count 2 would have been sufficient to support the jury's verdict, had the jury been properly instructed, it was ambiguous. Officer Kirby testified that she would not have ordered her dog to attack "without [Harrison] saying that he was going to do something to me," but she also said she was "not a hundred percent confident that he said he was going to attack me." And while at times Officer Kirby said that Harrison "started running" in her direction, at other times she said he merely "looked like he was starting to come running." Certainly it did not compel a finding of "force" under *Sommerstedt*—much less "assault" under *Chapman*.

**[9]** Because Harrison might not have been convicted absent error below, we reverse with respect to count 2. We need not decide whether the court erroneously instructed the jury that it could infer consciousness of guilt under count 2 from Harrison's flight after his encounter with Officer Kirby.

## III

**[10]** Harrison also challenges the district court's enhancement of his sentence for lying on the stand. We review for clear error, asking whether the district court could have found (1) that Harrison gave false testimony, (2) on a material matter, (3) with willful intent. *United States* v. *Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008). According to Harrison, the fact that he stuck to his story after trial shows that he "honestly, if somewhat delusively," believed his own testimony. But, after observing Harrison's demeanor, the district court concluded that he "concocted a fanciful story, and then in order to cover one lie, lied again and then lied again." In light of the patent discrepancy between Harrison's testimony, the physi-

cal evidence and the testimony of every other witness, we cannot say that was clear error.

\* \* \*

**[11]** We uphold the judgment of conviction with respect to count 1 and reverse with respect to count 2. We also vacate Harrison's sentence. *See United States* v. *Ruiz-Alvarez*, 211 F.3d 1181, 1184 (9th Cir. 2000). This partial affirmance does not condone what happened at trial. Rather, this mixed result suggests only that trials can sometimes serve justice despite strenuous efforts to the contrary.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

BYBEE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Harrison's conviction on count two must be reversed because the jury instruction on that count was faulty under our decision in *United States v. Chapman*, 528 F.3d 1215 (9th Cir. 2008). I respectfully dissent, however, from the majority's affirmance of Harrison's conviction on count one. This case is controlled by two decisions holding that improper prosecutorial questions regarding the credibility of witnesses constituted plain error requiring reversal of the defendants' convictions. *See United States v. Combs*, 379 F.3d 564 (9th Cir. 2004); *United States v. Geston*, 299 F.3d 1130 (9th Cir. 2002). Distilled to its essence, the case against Harrison consisted of little more than a credibility contest between him and the two military police officers whom he accused of abusing their authority. In light of the extensive misconduct at trial, and the conflicting evidence of Harrison's guilt, I cannot say with confidence that he would

have been convicted of assaulting Officer Jenkins in the absence of the prosecutor's improper questioning.

I

Because the majority neglects to set forth the facts, I am going to present them briefly.

The events at issue in this case took place on "Army Beach," a portion of Mokuleia Beach in Oahu. The Army declared the area off-limits at night and military police patrolled the beach each evening to enforce this prohibition. On the night of March 9, 2007, military police officers Travis Jenkins and Amber Kirby were patrolling the beach with Kirby's narcotics dog. At approximately 11:53 p.m., the officers saw Harrison's silver Mazda parked near the beach.

Harrison and Officers Jenkins and Kirby offer conflicting accounts of what occurred next. According to the officers, Harrison refused multiple directives to leave the beach and instead yelled profanities at them. In response to Harrison's display, the officers requested his identification and vehicle registration information; after a brief period of grudging cooperation, Harrison attempted to flee the officers by running towards nearby bushes. When Officer Jenkins attempted to bring Harrison back, Harrison punched him in the face. Officer Kirby eventually caught up with Harrison in the woods, where Harrison again mouthed profanities at her. Officer Kirby was frightened by Harrison's movements towards her but her narcotics dog refused to attack Harrison and he was thus able to flee the scene.

Harrison, for his part, told a markedly different story at trial. According to Harrison, he had two or three beers at a friend's house, but stopped drinking between 6:30 and 6:45 p.m. Harrison went home, but left just before 10:00 p.m. in response to a friend's invitation to come to a party near the beach. Upon arriving at the beach, Harrison was unable to

find his friends, so he parked in the area near the bushes. At that point, Officers Jenkins and Kirby approached and told him he was on military property. Harrison apologized, told them why he was on the beach, and offered to leave, but the officers demanded to see identification and would not allow him to depart. After allowing the officers to run his Hawaii driver's license, Harrison asked again if he could leave, but the officers told him "No, you cannot go. We're not letting you go that easy. We're not letting you go without—without finding something on you." Harrison protested the treatment he was receiving and claimed it was harassment, but Officer Jenkins told him that he could do whatever he wanted, and patted his gun.

Harrison then started walking towards the bushes. Officer Jenkins jumped on top of him and both men hit the ground hard, with Harrison using his right hand to break the fall. Harrison then ran for the bushes to get help. He denied both punching Officer Jenkins and assaulting Officer Kirby while the two were in close quarters in the bushes.

Officer Kirby then returned to the scene of these disputed events and two Hawaii state police officers, Kenneth Roberts and Kalai Phillips, arrived at the beach a few minutes after being called. After about an hour, Officer Roberts left the scene and he received a dispatch indicating that Harrison had contacted the Hawaii Police Department claiming that his car had been stolen. Officer Roberts informed his field supervisor that Harrison was the individual for whom the military was looking. Officer Roberts invited Harrison to accompany him to Army Beach to retrieve his car, which Harrison agreed to do. Upon their arrival, Officers Jenkins and Kirby, with the assistance of the Hawaii police officers, placed Harrison under arrest.

On August 9, 2007, a federal grand jury in the district of Hawaii indicted Harrison for, among other things, assault on a federal officer, in violation of 18 U.S.C. §§ 111(a)(1) and

(b), against Officer Jenkins, and misdemeanor assault on a federal officer, in violation of 18 U.S.C. § 111(a)(1), against Officer Kirby. After trial, the jury convicted Harrison of both counts.

## II

To their combined credit, neither the majority nor the government attempts to defend the outrageous behavior of the lead prosecutor in this case. Indeed, the prosecutor's veracity-based questioning was so extensive that summarizing it all is no easy task. I counted at least twenty-six separate questions of this nature. The subjects covered by these improper questions included, but were not limited to, the following: (1) Whether Officer Kirby had "made up" the claim that Harrison charged at her and that she drew her weapon in response [ER 601]; (2) whether the government's witnesses similarly made up the location where Harrison's car was parked [ER 602]; (3) whether Officers Jenkins and Kirby had lied in asserting that Harrison harassed them [ER 602-03]; (4) whether both officers lied in claiming that they told Harrison that he was on Army property and thus needed to leave [ER 604]; (5) whether the officers were in a conspiracy against him [ER 604]; (6) whether Officers Jenkins, Kirby, and Roberts were "dirty cops" [ER 605]; (7) whether Harrison was "saying that their [sic] going on the stand, swearing an oath to testify to the truth and then lying against [him]"[ ER 605]; (8) whether Officers Jenkins and Kirby made up the claim that Harrison told them that he used to be in the Air Force [ER 611]; (9) whether other witnesses who testified that they saw swelling on Officer Jenkins's face shortly after the disputed events occurred were lying [ER 617]; (10) whether Officer Kirby made up the claim that Harrison told her, from the bushes, "F*** you and your f*****' dog, I'm not afraid of you and your f*****' dog" [ER 623]; and (11) whether Officers Kirby and Jenkins, as well as Investigator Sutherland, had lied in claiming that Harrison "curs[ed] up a storm" at all three of them [ER 636-37]. The prosecutor closed his cross-

examination by asking Harrison whether the officers were "in cahoots against him" and whether they had lied in order to get him in trouble. [ER 641]. The prosecutor even took the extraordinary step of pitting his own credibility against Harrison's.

As Harrison correctly notes and the majority acknowledges, the prosecutor's improper questioning was not simply a matter of one or two isolated incidents; it was the underlying theme of the prosecutor's entire cross-examination. [Blue Br. 37; Maj. Op. at 14408]. Virtually every line of the trial transcript devoted to the cross-examination contains objectionable content. Indeed, the extensive summary above actually understates the prosecutor's misconduct. In response to some of the prosecutor's questions, Harrison initially resisted the conclusion that discrepancies between his testimony and that of other witnesses were the result of deliberate misrepresentations, and the prosecutor repeated several questions multiple times (often in a slightly different form) in an attempt to elicit additional statements from Harrison to the effect that other witnesses were lying. [*See, e.g.*, ER 602-03, 605, 641-42].

Jurors are almost always confronted with conflicting testimony from different witnesses. That is why we have the jury; if there aren't any conflicts, then the case can be resolved on summary judgment (at least in the civil context). Resolving these he said/she said conflicts is a first-order determination. We expect the jurors to work through the conflicts and decide for themselves who, if anyone, has accurately described the events. This the jurors must do "by assessing the witnesses and witness testimony in light of their own experience." *Geston*, 299 F.3d at 1136 (internal quotation marks omitted).

By contrast, we do not permit second-order questions: That is, we do not permit attorneys to support or undermine witnesses by either vouching for their veracity ("Brutus is an honorable man") or branding them unreliable ("All Cretans are liars"). Accordingly, "it is reversible error for a witness to

testify over objection whether a previous witness was telling the truth." *Id.*; *see also Combs*, 379 F.3d at 572 (improper to ask witness whether law enforcement official was lying); *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999) (same). As the majority notes, counsel—regrettably—failed to object to the prosecutor's questions. Nonetheless, in *Combs* and *Geston*, the defendants' attorneys also did not object to improper veracity-based questioning at trial but we nonetheless concluded in both cases that such questioning constituted plain error requiring reversal of the defendants' convictions.

## III

With all due respect to my colleagues in the majority, our decisions in *Combs* and *Geston* mandate reversal of both of Harrison's convictions. The unprofessional conduct in this case was far more extensive than in *Combs* and probably *Geston* as well.[1] In *Combs*, we found plain error based on a single exchange in which the prosecutor in that case elicited testimony from the defendant that a federal agent was lying (the prosecutor referred back to this exchange in his closing argument). 379 F.3d at 567. That exchange, although clearly improper, pales in comparison to what occurred here.

Of course, it is well established that "[w]hen applying the plain error standard, we consider all circumstances at trial including the strength of the evidence against the defendant." *United States v. Rudberg*, 122 F.3d 1199, 1206 (9th Cir. 1997) (internal quotation marks omitted). Accordingly, we

---

[1] I say "probably" because in *Geston* we provided the transcript of the government's questioning of one witness, but we merely observed that the government "[s]imilarly" questioned a second witness. 299 F.3d at 1136. If the questioning of the second witness was indeed similar, the prosecutorial abuse in this case far exceeded the improper questioning in *Geston*. Moreover, unlike in this case, the improper questioning in *Geston* was limited to the testimony of two outside witnesses, rather than the defendant himself, another factor that made the questioning here far more damaging to Harrison's right to a fair trial.

have affirmed convictions even after acknowledging that improper veracity-based questioning occurred at trial. *See, e.g.*, *United States v. Ramirez*, 537 F.3d 1075, 1086-87 (9th Cir. 2008).

Having said that, the government's evidence against Harrison was not nearly strong enough to justify affirmance of his conviction on count one. To be fair, Harrison almost certainly mischaracterized events on several occasions during his testimony at trial. Harrison testified that he only had "a couple of beers with dinner" several hours prior to his encounter with Officers Jenkins and Kirby and that he was not intoxicated during any of the events in dispute. However, Officer Roberts testified that Harrison's eyes were red, watery, glassy and bloodshot and that he smelled strongly of alcohol. Harrison also admitting donning a trash bag as clothing after the incident, behavior that is not generally associated with sobriety. When Harrison called 911, he falsely (or at least misleadingly) reported that his car was stolen, but he did not mention the incident with Officers Jenkins and Kirby or even allude generally to an encounter with military police. Harrison also did not tell Officer Roberts about his encounter with the two military police officers while Officer Roberts was transporting him back to the beach. Moreover, Harrison's account of his arrest was refuted by the four officers at the scene, who all testified that Harrison physically resisted and shouted profanities at them.

The majority has great fun with Harrison's story. However, virtually all of the discrepancies relied upon by the majority involve collateral issues. Harrison did himself no favors by denying that he resisted arrest and claiming that he was not intoxicated, but Harrison was not charged with public intoxication, and count one had nothing to do with whether he resisted arrest after Officer Roberts transported him back to the beach. Rather, the jury's determination on count one turned solely on whether the jury believed that Harrison

assaulted Officer Jenkins when he and Officer Kirby initially encountered Harrison.

The physical evidence bearing on this question didn't amount to a hill of beans. Investigator Sutherland testified that Officer Jenkins had a bruise on his face shortly after the initial encounter with Harrison and he described the bruise as a "7 to 8" on a scale from one to ten; however, Investigator Sutherland took two photographs of Officer Jenkins's face within hours of the disputed events, neither of which depict any noticeable redness or swelling. [*Compare* ER 415-16, *with* DSER 1-3]. Even assuming that Officer Jenkins's injuries were indeed far more severe than these photos indicate, any such injuries are quite arguably consistent with Harrison's version of events, in which he claimed that Jenkins initially tackled him and that both of them then hit the ground hard. The majority also relies upon testimony of an injury to Harrison's knuckles, but we don't have any visual evidence indicating the severity of this injury; given the government's seeming exaggeration of the injuries to Officer Jenkins's face, I am not inclined to take this testimony at face value (no pun intended) and the majority shouldn't either. In any event, while the jury could have found this to be evidence of assault, it also could have accepted Harrison's claim that any such injury was the incidental result of Jenkins having tackled him. Contrary to the majority's characterization then, the jury's determination on count one indeed involved little more than a credibility contest between Harrison on the one hand, and Officers Jenkins and Kirby on the other.

In *Combs*, we faced an evidentiary landscape quite similar to the one at issue here: "the circumstantial evidence of the charged offense" was not particularly strong and "[m]uch of it was equally consistent with Combs's defense," leaving the jury with a credibility dispute between Combs on the one hand, and a DEA agent and jailhouse informant on the other. 379 F.3d at 572-73. We concluded that this evidence was not strong enough to uphold Combs's conviction. As I noted

above, the improper questioning in this case was far more extensive than that at issue in *Combs*.

Although the majority recognizes that the prosecutor's questions were improper, it essentially concludes that the questions didn't matter because they "only highlighted a credibility judgment that Harrison was himself asking the jury to make." Maj. Op. at 14410. This point, however, applies in almost any case in which a prosecutor asks impermissible second-order questions regarding the credibility of other witnesses. For example, there would obviously have been no point in even asking such questions here if Harrison had offered a legal defense or theory in which the credibility of opposing witnesses was *not* at issue—such as entrapment, insanity, or mistaken identity. Indeed, in *Geston*, we specifically noted that such questioning was particularly improper "[i]n a case where witness credibility was paramount." 299 F.3d at 1137.

This case provides a perfect example of the prejudicial effect of such questions. Harrison may well have been lying about what happened between him and Officers Kirby and Jenkins. But it's not as though his story was implausible— Officers Kirby and Jenkins would hardly be the first law enforcement officers to abuse their authority by harassing someone without provocation. And two additional facts lend at least some support to his story. First, Officers Jenkins and Kirby paint a picture of Harrison as profane and belligerent but it is undisputed that he furnished his driver's license to them upon request; that's how they knew who he was. Second, if Harrison in fact knew he was guilty of assaulting two military officers, it is somewhat strange that he would call the police and return to the beach to retrieve his car, particularly since he had to have known that Officers Jenkins and Kirby had taken his driver's license and thus knew his identity.

It is not our role to weigh this evidence. It suffices to say that a jury could certainly believe that Harrison was border-

line intoxicated and that his behavior irritated Officers Jenkins and Kirby but nonetheless conclude that Harrison did not assault Officer Jenkins and that the officers forced the confrontation by arbitrarily refusing to allow him to leave and then tackling him when he attempted to walk away. But by compelling Harrison repeatedly to accuse four separate witnesses of lying and then ridiculing him directly thereafter, the prosecutor made it more difficult for the jury to perform its duty to independently evaluate the credibility of the witnesses who offered conflicting testimony. The prosecutor's questions were particularly harmful in this case because some of them identified conflicts that had no bearing on whether Harrison had assaulted Officers Jenkins and Kirby, but were instead designed to depict Harrison as an absurd, paranoid individual by forcing him repeatedly to accuse other witnesses of lying.

IV

Because the only direct evidence of Harrison's guilt rose and fell on the credibility of two hardly disinterested witnesses—the precise issue that the prosecutor improperly and repeatedly injected into his cross-examination of Harrison —I would vacate Harrison's conviction on count one. I thus respectfully dissent from that portion of the judgment.