Opinion by Judge WARDLAW; Dissent by Judge RAWLINSON.
OPINION
WARDLAW, Circuit Judge:
Martin Alcantara-Castillo (Alcantara) appeals his jury trial conviction for illegal reentry in violation of 8 U.S.C. § 1326. *1189 Because the government’s improper cross-examination and argument deprived Alcan-tara of the fair trial guaranteed by the Due Process Clause, we reverse.
I.
On June 26, 2011, Border Patrol Agent Aaron Hunter responded to a report that a motion sensor had been activated approximately seven miles east of the Tecate port of entry. Searching the area, he found Alcantara lying next to an abandoned cargo container approximately one mile north of the Mexican border. Alcantara was carrying a backpack and was very dirty. Agent Hunter approached Alcantara, questioning him in Spanish. Alcantara admitted that he was a “citizen of Mexico and that he did not have any documents allowing him to be in the United States.”
Agent Hunter testified that as he escorted Alcantara toward the highway where he had parked his patrol car, Alcantara spontaneously began talking. According to Agent Hunter, Alcantara volunteered that he had crossed the border on foot the previous night with a group that had been chased by border patrol agents on all-terrain vehicles. Alcantara said he had become separated from the group and had decided to turn around and return to Mexico. As Agent Hunter and Alcantara returned to the highway, two other Border Patrol agents joined them. They searched Alcantara, finding empty bottles and food containers in his backpack.
On cross-examination, Agent Hunter acknowledged that he did not personally search Alcantara’s backpack, that he did not take an inventory of its contents, and that he could not specifically identify what was inside. Agent Hunter also testified that on the day of Alcantara’s arrest he provided information about the arrest to another agent who prepared an official report, after which Agent Hunter wrote a detailed addendum to the report. Neither of those documents contain any mention of Alcantara’s spontaneous admissions about crossing the border with a group, being chased by border patrol agents on all-terrain vehicles, and attempting to return to Mexico. Nor could Agent Hunter recall that he told anyone at all about these spontaneous statements until he met with prosecutors in preparation for Alcantara’s trial seven months after Alcantara’s arrest.
Border Patrol Agent Joseph Moore testified that the night before Alcantara’s arrest, he was notified that a group of nine aliens had been observed near the border. Four of the group had been apprehended immediately, but five had fled. Agent Moore searched the area and was able to apprehend four more aliens, but he could not locate the ninth member of the group, whose sex and identity were unknown.
Taking the witness stand, Alcantara testified that he had unknowingly entered the United States during a period of methamphetamine-induced psychosis. Border Patrol Agent Luis Martinez, who interviewed Alcantara shortly after his arrest, testified that pursuant to Border Patrol policy, he immediately terminated, that interview when Alcantara stated that he was under the influence of methamphetamine. However, Agent Martinez did not observe anything in Alcantara’s demeanor that led him to believe Alcantara was under the influence of methamphetamine, although Alcan-tara was hunched over during the interview.
Alcantara admitted that he had been addicted to methamphetamine since 1995 and used the drug daily, stopping only when he was incarcerated. On June 24, 2011, while high on methamphetamine, he impulsively decided to enter a rehabilitation program after talking with another methamphetamine user about a friend who had died three months earlier due to drug abuse. Alcantara went to a bus depot in *1190 Tijuana, where he lived, early in the morning on June 25, for the purpose of traveling to a drug rehabilitation facility located in El Hongo, east of Tecate. Before boarding, however, he purchased some more methamphetamine near the bus depot in Tijuana.
Upon his arrival in Tecate, Alcantara decided to visit a friend who lived on the outskirts of the city to tell him that he was going to check into a rehabilitation clinic, but he never reached his friend’s home. While walking there along some railroad tracks, he encountered two men in a railroad tunnel with whom he began a conversation. Alcantara ended up smoking methamphetamine with these men — a larger quantity of methamphetamine than he had ever used before. Alcantara testified that he began to hallucinate, and that the next thing he remembered was walking down a road, seeing a small farm with some palm- trees,' picking up a bottle of water, and lying down next to a container of some sort. Without objection, the defense introduced a photograph of the railroad tunnel, and Alcantara- showed the jury where he had been walking, where the train tracks were, and where he stumbled upon the two men.
Alcantara thought he was on the road that goes from Tecate to Mexicali in Mexico. It was not until Agent Hunter approached and he saw Agent Hunter’s uniform that he realized he was in the United States. Alcantara acknowledged that he told Agent Hunter he was from Mexico, but did not remember saying anything else to him except to ask for water.
Two additional witnesses testified for the defense. A medical expert in addiction psychiatry who had interviewed Al-cantara opined that Alcantara was -severely methamphetamine dependent, based upon Alcantara’s description of his methamphetamine use. He further testified that people who use methamphetamine daily may suffer hallucinations, paranoia, and disorientation as to time and place, especially if they are also suffering from sleep deprivation, dehydration, or extreme heat. A defense investigator also testified that she had visited a drug rehabilitation facility in El Hongo, along the highway from Tecate to Mexicali, and had located a railroad tunnel near the border in the eastern outskirts of Tecate. The defense also introduced a photograph of a gap in the border fence near the site of Alcantara’s arrest.
The jury found Alcantara guilty, and the district court sentenced him to a forty-month term of imprisonment. Alcantara timely appealed.
II.
We have jurisdiction pursuant to 28 U.S.C. § 1291. Where the defendant has objected to alleged prosecutorial misconduct at trial, we review for harmless error.[1] We view the challenged conduct “in the entire context of the trial,” and reverse “only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial.” Ruiz, 710 F.3d at 1082 (quoting Younger, 398 F.3d at 1190). Where the defendant has not objected to the alleged misconduct at trial, we review for plain error. We *1191 may reverse if: (1) there was error; (2) it was plain; (3) it affected the defendant’s substantial rights; and (4) “viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings.” United States v. Combs, 379 F.3d 564, 568 (9th Cir.2004) (quoting United States v. Geston, 299 F.3d 1130, 1135 (9th Cir.2002)). When assessing the combined prejudicial effect of multiple errors, only as to some of which the defense registered a timely objection, we apply the plain error standard. See United States v. Weatherspoon, 410 F.3d 1142, 1150-51 (9th Cir.2005).
III.
A prosecutor “is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). A “prosecutor’s job isn’t just to win, but to win fairly, staying well within the rules.” United States v. Maloney, 755 F.3d 1044, 1046 (9th Cir.2014) (en banc) (quoting United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir.1993)).
A prosecutor must not ask defendants during cross-examination to comment on the truthfulness of other witnesses. See, e.g., United States v. Harrison, 585 F.3d 1155, 1158 (9th Cir.2009); Combs, 379 F.3d at 572; United States v. Sanchez, 176 F.3d 1214, 1219-20 (9th Cir.1999). This rule is “black letter law,” Harrison, 585 F.3d at 1158, and it ensures that determinations of credibility remain within the sole province of the jury. See Sanchez, 176 F.3d at 1219-20. Nor may prosecutors “vouch” for a witness by offering their personal opinion of a witness’s testimony, or suggesting that information exists outside the record that verifies the witness’s truthfulness. See, e.g., Weatherspoon, 410 F.3d at 1146—48; Combs, 379 F.3d at 574-75; Sanchez, 176 F.3d at 1224. Vouching compromises the integrity of the trial and denies the defendant due process because the “prosecutor’s opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government’s judgment rather than its own view of the evidence.” United States v. Reyes, 577 F.3d 1069, 1077 (9th Cir.2009) (internal quotation marks omitted).
Alcantara argues that the government engaged in improper questioning or vouching oh four occasions during his trial. We conclude that there were two instances of improper conduct.
A.
Error occurred when the prosecutor implicitly and then explicitly asked Al-cantara to comment on Agent Hunter’s veracity during cross-examination. Agent Hunter had testified to certain “spontaneous” admissions made by Alcantara, but Alcantara testified that he only asked Agent Hunter for water and acknowledged his Mexican citizenship. Toward the end of the government’s cross-examination of Alcantara, the prosecutor initiated the following exchange:
Q: Now, it’s your testimony you didn’t recall any additional statements you made to the Border Patrol Agent on the day of your arrest for this case, correct?
A: I don’t remember having told him anything.
Q: You sat here throughout this trial, correct?
A: Yes.
*1192 Q: And you heard Border Patrol Agent Hunter testify that you had told him about coming in the day before with a group? You’ve heard that, correct?
A: I don’t remember. I don’t remember.
Q: You were sitting right here yesterday.
A: Yes, but I don’t remember if he said that.
Q: You don’t remember him saying, and your attorney repeatedly asking him, about your statements: that you had crossed over the day before and gone further north with a group? You don’t remember that?
A: I don’t think so. I don’t think I crossed with people. I wasn’t with people.
Q: That is not what I’m asking you. I’m asking you if you remember Agent Hunter, yesterday, .telling the jury that you had made the statement that you had told him that you had crossed and gone further north?
A: Agent Hunter, he can say whatever he wants. He is saying I had a black sweater the day of my arrest, that I had food in my backpack, and there is nothing of that. That was all invented. All these things were invented.
Q: Your testimony is that Agent Hunter is inventing stories about you; is that correct?
A: Where are my things?
Defense counsel objected to “this line of questioning as vouching for Agent Hunter’s testimony.” The district court erred by overruling this objection. But even if we view counsel’s objection as untimely, it was plain error to permit the prosecutor to ask, “Your testimony is that Agent Hunter is inventing stories about you; is that correct?” We found analogous questioning improper in Combs, 379 F.3d at 567, 572. There, a DEA agent testified that the defendant admitted to manufacturing methamphetamine. Id. at 567. The defendant testified that he never made such an admission, and on cross-examination, the prosecutor questioned the defendant as follows:
Q: You told Special Agents Bailey and Cory that you last manufactured methamphetamine on or about August 5, isn’t that correct?
A: I did not.
Q: So Special Agent Bailey is making that up?
A: I told you what happened. He said. I didn’t say. He answered. I ended the interview.
Q: So you are saying that Special Agent Bailey is lying in his testimony?
Id. Just as the prosecutor asked the defendant in Combs if Special Agent Bailey was “making that up” or “lying in his testimony,” the prosecutor here asked Alcantara if Agent Hunter was “inventing stories about you.” In Combs, we concluded that the prosecutor’s questioning constituted plain error. Id. at 572. See also Harrison, 585 F.3d at 1158 (finding error where the prosecutor asked the defendant if two testifying police officers were lying); Sanchez, 176 F.3d at 1219-20 (finding error where the prosecutor forced the defendant to call a U.S. marshal who testified a liar).
The dissent, assuming that plain error is the correct legal standard, finds a “crucial distinction” between this case and others because the prosecutor used the word “invent” instead of the word “lie.” Dissent at 1201-02. This distinction is not meaningful, much less “crucial.” In the context we address, to “lie” and to “invent” have identical meanings: to fabricate information. See Black’s Law Dictionary 1062 (10th *1193 ed.2014) (defining “lie” as “[a] false statement or other indication that is made with knowledge of its falsity; an untruthful communication intended to deceive”); Webster’s Third New International Dictionary 1188 (2002) (defining the secondary meaning of the verb “invent” as “to think up or imagine: concoct mentally: fabricate”); id. at 1805 (defining the verb “lie” as “to make an untrue statement with intent to deceive: tell a lie”); see also 8 Oxford English Dictionary 39 (2d ed.1989) (defining the secondary meaning of the verb “invent” as “[t]o devise something false or fictitious: to fabricate, feign, ‘make up’ ”); id. at 905 (defining the verb “lie” as “[t]o tell a lie or lies, to utter falsehood; to speak falsely”). No matter which words are used to mean “intentional deception,” the concept remains the same: it is improper to compel the defendant “to comment on the truthfulness of another witness.” Harrison, 585 F.3d at 1158.
The dissent’s reliance on United States v. Greer, 640 F.3d 1011 (9th Cir.2011), is misplaced. We noted in Greer that we had “not yet addressed whether it is improper for the prosecutor to ask the defendant, as the prosecutor did in [that] case, if a witness testified ‘inaccurately.’ ” Id. at 1023. We distinguished that question from asking “whether a government witness had been ‘less than candid’ during his testimony.” Id., n. 8. Reasoning that “[b]eeause we see no difference between asking whether a witness was ‘lying’ -or being ‘less than candid,’ ” we held that the “less than candid” question “was improper.” Id.
Here, the prosecutor did not ask whether the agent’s testimony was inaccurate; he asked whether the agent was “inventing stories” about Alcantara. Inaccuracy or mistake can be achieved through inadvertence or other unintentional error. Lying, making up, or inventing are all deliberate and intentional falsehoods, like “being less than candid.” Do we really want to narrow the prohibition against asking the defendant to comment on the veracity of another agent to the use of the word “lie?” Prosecutors could simply evade the rule by asking whether another witness was “not telling the truth,” fibbing, fabricating, making the story up, falsifying, committing perjury, being “less than candid,” or whether his story was “cock and bull.”[2] Surely the admonition against asking a defendant to comment on a government witness’s veracity is violated equally when any of these formulations is used. The remaining questions to be asked on plain error review should be answered by addressing the circumstances of each case.
We also reject the government’s assertion that the prosecutor was merely following up appropriately after Alcantara “spontaneously attacked” Agent Hunter’s credibility. In United States v. Moreland, 622 F.3d 1147 (9th Cir.2010), the government summarized the relevant testimony of one of its witnesses and asked the defendant whether he remembered the testimony. Id. at 1159. The defendant responded, “That’s what her testimony was. That is not true.” Id. We held that this response did not justify further questioning of the defendant about the witness’s credibility. Id. at 1160. Indeed, we found the government’s argument that “the prosecution had no choice but to follow up Moreland’s statement by asking whether [the witness] was lying” to “make[ ] little sense.” Id. While the follow-up questions about the witness’s credibility, in Moreland were more extensive than the single follow-up question here, the principle nonetheless applies.
*1194 Moreover, Alcantara’s comments about Agent Hunter’s testimony were not spontaneous, but were in fact induced by the line of the prosecutor’s questioning, in which he pressed Alcantara five times about Agent Hunter’s testimony before Al-cantara responded that the Agent’s testimony as to the black sweater, food in the backpack, and “[a]ll these things were invented.” There is only one plausible explanation for the prosecutor’s persistent effort to confirm that Alcantara had heard Agent Hunter’s previous testimony: to induce Alcantara to comment on whether that testimony was true. And the prosecutor ultimately achieved the desired result: Following Alcantara’s “[a]ll these things were invented” testimony, the prosecutor immediately pounced with, ‘Tour testimony is that Agent Hunter is inventing stories about you; is that correct?” Alcantara was once again forced to comment on Agent Hunter’s veracity, and he did by asking the prosecutor “Where are my things?,” as if to prove Agent Hunter was lying when he testified as to the contents of Alcantara’s backpack.
The government argues that the prosecutor might have asked these questions to determine whether Agent Hunter’s testimony had refreshed Alcantara’s recollection of his statements on the day of his arrest. This explanation makes little sense, however, as Alcantara had just testified on direct that he did not recall making those statements, so it was already evident that his memory had not been refreshed by Agent Hunter’s testimony the day before. The natural and sole purpose of asking Alcantara about Agent Hunter’s testimony recounting Alcantara’s alleged statements — rather than simply asking about the statements themselves— was to induce Alcantara to comment on Agent Hunter’s veracity. Whether Alcan-tara, “remembered” Agent Hunter’s testimony was of no import to the case; the prosecutor achieved what he wanted when his questioning resulted in Alcantara’s testimony that Agent Hunter had invented his story. Thus, the prosecutor improperly created a scenario that forced Alcantara to comment on Agent Hunter’s veracity.
B.
The prosecutor’s initial closing argument was not plainly improper. The central theme of the government’s argument was to compare Agent Hunter’s credibility with Alcantara’s credibility. The prosecutor began his argument by stating: “Credibility. This case is largely going to come down to the issue of credibility.” He then compared the two key witnesses’ competing narratives of events. “[IJf you believe Border Patrol Agent Aaron Hunter,” the prosecutor argued, then Alcantara confessed to having knowingly entered the United States with a group. “If you believe the defendant’s story,” by contrast, “then it would have been impossible” for Alcantara to have confessed be-causé he did not know he had entered the United States. The prosecutor then argued that “one of those two witnesses is not telling the truth.” Alcantara contends that this last statement amounted to misconduct.
Because it was reasonable to infer from the evidence that either Agent Hunter or Alcantara was lying, the challenged statement was not plainly improper. Prosecutors must generally avoid statements “to the effect that, if the defendant is innocent, government agents must be lying.” Sanchez, 176 F.3d at 1224 (internal quotation marks omitted). However, the government must be given reasonable latitude in closing argument, and in “a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of [the] two sides is lying.” United States v. WUkes, 662 F.3d 524, 541 (9th *1195 Cir.2011) (quoting United States v. Molina, 934 F.2d 1440, 1445 (9th Cir.1991)). For example, the government is allowed to argue that “somebody is lying” when the government and defense witnesses present wholly incompatible testimony regarding who initiated a drug transaction. Molina, 934 F.2d at 1445; see also Wilkes, 662 F.3d at 541 (finding no impropriety in the government’s argument that “[y]ou can’t believe both” the defendant and prosecution witnesses). This case similarly reduces to which of two conflicting accounts is true. Agent Hunter’s narrative and Alcantara’s narrative cannot be reconciled, and “the inference is unavoidable” that one of them was lying. Molina, 934 F.2d at 1445.
Nor did the prosecutor’s vouching for Agent Hunter’s credibility rise to the level of plain error when he later argued: “Agent Hunter’s testimony remained consistent. It remained believable, and it remained logical.” This ambiguous statement is reasonably understood in either of two ways: as an impermissible assertion of the prosecutor’s personal opinion that Agent Hunter’s testimony was consistent, believable, and logical; or as a permissible argument that the jury should find Agent Hunter’s testimony consistent, believable, and logical. -We have held that a prosecutor’s summary of what “we know” about the evidence does not constitute improper vouching when the surrounding context suggests that, despite the personal language, the prosecutor is drawing inferences from evidence in the record rather than offering an opinion. Younger, 398 F.3d at 1190-91. Here, when the statement is viewed in context, the prosecutor appears to be employing the language of the district court’s jury instruction as to credibility to argue that the jury should believe Agent Hunter based upon inferences it could draw from the evidence. The challenged statement was ambiguous, and it did not clearly “place[ ] the prestige of the government behind a witness through personal assurances of the witness’s veracity.” Id. at 1190 (quoting United States v. Leon-Reyes, 177 F.3d 816, 822 (9th Cir.1999)). It therefore did not amount to plain error.
C.
The government concedes that it improperly vouched for Agent Hunter’s credibility when it began its rebuttal argument by stating: “Ladies and gentlemen, this case boils down to the credibility of a 15-year methamphetamine addict, a man who has every incentive to lie, versus the testimony and the evidence of Border Patrol agents who are sworn to uphold the law.” There was no evidence in the record that Border Patrol agents are “sworn to uphold the law.” As the government appropriately concedes, the prosecutor vouched for Agent Hunter’s credibility by referring to facts not before the jury to convince it in this credibility showdown that Agent Hunter was telling the truth, as he was sworn to do. See, e.g., Combs, 379 F.3d at 574; Sanchez, 176 F.3d at 1224-25. We have previously made clear that a prosecutor may not argue that “the existence of legal and professional repercussions” for law enforcement officers serves to “ensure the credibility of the officers’ testimony.” Weatherspoon, 410 F.3d at 1146. That is precisely what the prosecutor did here.
IV.
While Alcantara timely objected to the prosecutor’s improper rebuttal argument, and arguably timely objected to the prosecutor’s improper cross-examination, we need not decide whether to apply harmless error analysis here. Even under the more restrictive plain error standard the combined misconduct requires reversal. Id. at 1151.
*1196 Under the plain error standard, where prosecutorial misconduct affects the defendant’s substantial rights and seriously affects the fairness, integrity, or reputation of judicial proceedings, the misconduct is reversible error. See Combs, 379 F.3d at 568. To determine whether the misconduct affected the defendant’s substantial rights, we “look to the substance of any curative instructions, and the strength of the case against the defendant absent the misconduct.” United States v. Sanchez, 659 F.3d 1252, 1257 (9th Cir.2011). There is no bright-line rule for determining whether reversal is appropriate. Rather, we may consider various relevant factors, including the form and timing of the misconduct, the extent to which the prosecutor asserted a personal opinion or implied extra-record knowledge, the importance of the testimony to which the improper conduct related, and the specificity and timing of any curative instruction. See Ruiz, 710 F.3d at 1085.
We have repeatedly reversed convictions for plain error in cases in which “witness credibility was paramount” and the prosecutor sought to bolster critical testimony through improper conduct. Combs, 379 F.3d at 573 (quoting Geston, 299 F.3d at 1137); see also Weatherspoon, 410 F.3d at 1151; Kerr, 981 F.2d at 1054. There is no question that witness credibility was paramount in this case. As the prosecutor himself stated: “Credibility. This case is largely going to come down to the issue of credibility.”
This particular credibility contest was made even closer by the significant credibility problems of each of the contestants. Alcantara’s drugged memory was spotty and selective at best. He remembered some highly specific details of his journey, such as the quantities of methamphetamine he purchased en route, and filling up a water bottle with dirty water near palm trees, while providing inconsistent testimony about his prior use of methamphetamine, among other subjects. And Alcantara’s four prior convictions for illegal reentry, which he acknowledged during cross-examination, surely impaired his credibility.
On the other hand, Agent Hunter’s testimony that Alcantara spontaneously confessed to having knowingly entered the United States was not particularly believable. Agent Hunter failed to make any contemporaneous record of Alcantara’s alleged confession. The statements do not appear in either the Border Patrol’s report or Agent Hunter’s own “detailed” addendum. Nor did he tell anyone else about Alcantara’s alleged statements for at least seven months thereafter. It was not until Agent Hunter met with the prosecutors in this case that he somehow managed to recall and report Alcantara’s alleged spontaneous confession to the elements of a § 1326 violation. Moreover, Agent Hunter’s testimony that Alcantara had water bottles and empty food containers in his backpack was vague, unconvincing, and substantially undermined on cross-examination. On cross, Agent Hunter admitted that he had not personally searched Alcan-tara’s bag and was unable to recall the specific items it may have contained, contrary to his direct testimony. There was also no contemporaneous record or physical evidence of the bag’s alleged contents.[3]
Although Alcantara was a poor witness, the defense at least provided some corrob *1197 oration of the essential details of, his exculpatory narrative. The El Hongo rehabilitation center and the abandoned railroad tunnel where Alcantara testified he used methamphetamine actually existed. Evidence showed a gap in the border fence near the location of Alcantara’s arrest, which, Alcantara argued, allowed him to enter the United States easily. And a psychiatric expert provided unrebutted testimony that a habitual methamphetamine user could suffer hallucinations and disorientation as to time and place, especially if dehydrated and exposed to extreme heat. While this jury did not believe Alcantara, a jury in a trial unaffected by improper prosecutorial conduct reasonably could have believed him and concluded that he did not knowingly enter the United States — nr at least that the government failed to prove beyond a reasonable doubt that he did so.
The government’s conduct of the trial illuminates the closeness of the case and demonstrates that a conviction was far from assured. The more junior of the two U.S. attorneys handling the case, who was actually trying his first case, handled almost the entire trial. He gave the opening statement, examined Agent Hunter, cross-examined Alcantara, and offered the government’s initial closing argument. Then the more senior prosecutor stood up to argue the government’s rebuttal. After reintroducing himself to the jury, the senior prosecutor opened the rebuttal with the improper statement comparing “the credibility of a 15-year methamphetamine addict” to “the evidence of Border Patrol agents who are sworn to uphold the law.”
The senior prosecutor had ample opportunity to consider how to proceed in rebuttal. He chose to begin his remarks with a comment that an experienced Assistant United States Attorney would surely know approached, if not exceeded, the bounds of propriety. That the supervising prosecutor at trial — who, unlike us, actually observed the critical testimony and the jury’s response to the key witnesses — felt motivated to take this risk suggests he may have had doubts about the outcome. Indeed, this improper comment was not the only way in which the senior prosecutor aggressively pushed the limits of propriety in his rebuttal argument. The district court sustained an objection to the prosecutor’s misstatement of the evidence, and then spontaneously chided him for “trying to get around” the objection when he attempted to restate the point obliquely. The district court also admonished the prosecutor twice during his remarks for going beyond the proper scope of rebuttal, and then again after the jury had retired for “overd[oing] the true meaning of close by having a second bite of the apple.” That the government felt the need to engage in these improper tactics only enforces just how close the credibility contest was, further demonstrating that the combined misconduct, the questioning about Agent Hunter’s veracity and the improper rebuttal, was highly prejudicial.
Defense counsel did timely object to the senior prosecutor’s improper rebuttal argument, and the district court sustained the objection and instructed the jury to disregard the comment. We are not convinced, however, that the trial court’s instruction sufficiently cured the error. Our cases concerning prosecutorial vouching often require more than a quick statement that “the jury will disregard” the vouching to neutralize any prejudice. United States v. Simtob, 901 F.2d 799, 806 (9th Cir.1990). In Simtob, for instance, we found that the effect of vouching was not cured even though the district court had instructed the jury to disregard the comment and had provided relevant general jury instructions on credibility. Id. In other cases, we have found that “the manner in which [defense] objections were sustained unfortunately *1198 did not deliver the required strong cautionary message,” Weatherspoon, 410 F.3d at 1151, and we haye suggested that a “strongly worded curative instruction” may be necessary to cure vouching, Sanchez, 659 F.3d at 1258. See also Kerr, 981 F.2d at 1053 (examining the substance of a curative instruction to determine whether vouching was prejudicial). Here, a firmer and more specific curative instruction would have been particularly appropriate. Because the government’s rebuttal was the last thing the jury heard before beginning its deliberations, “the impact” of the mis-, conduct was “likely to be significant.” Sanchez, 659 F.3d at 1259.
For these reasons, we conclude that the errors at trial affected Alcantara’s substantial rights. It was fundamentally unfair and prejudicial to Alcantara to compel him to impugn the veracity of Agent Hunter’s critical, and possibly, determinative, testimony. Combs, 379 F.3d at 573. This error was “compounded” by improper vouching that was not fully remedied by the district court’s minimal curative instruction. Id. at 574. As the government itself argued, the jury was faced with a choice between believing Agent Hunter or believing Alcantara. Both witnesses’ accounts of the events in question were profoundly flawed, and given the government’s burden of proving guilt beyond a reasonable doubt, the jury plausibly could have acquitted Alcantara if the trial had been untainted by prosecutorial misconduct. In light of the senior prosecutor’s conduct in rebuttal argument, we also conclude that the errors “seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.” Ruiz, 710 F.3d at 1085 (quoting Sanchez, 659 F.3d at 1256).[4]
V.
By asking Alcantara to comment on the credibility of the key witness against him, and then referring to evidence not before the jury to bolster that witness’s testimony, the government crossed the fine line separating the vigorous pursuit of justice from the overzealous pursuit of victory. These improper tactics compromised the fairness of the trial. We reverse Alcan-tara’s conviction and remand for further proceedings consistent with the demands of due process.
REVERSED AND REMANDED.

. "Misconduct” is the term of art that we regularly use to describe improper behavior by prosecutors that is inconsistent with the due process requirements of a fair trial. See, e.g., United States v. Ruiz, 710 F.3d 1077, 1082 (9th Cir.), cert. denied, - U.S. -, 134 S.Ct. 488, 187 L.Ed.2d 330 (2013); United States v. Wright, 625 F.3d 583, 609-10, 613 (9th Cir.2010); United States v. Younger, 398 F.3d 1179, 1190 (9th Cir.2005); United States v. Kerr, 981 F.2d 1050, 1051-52 (9th Cir.1992). The use of this generic term does not necessarily imply that the prosecutor intentionally broke the rules or acted in bad faith.

. “Tell a tale of cock and bull, / Of convincing detail full; / Tale tremendous, / Heaven defend us! / What a tale of cock and bull!” W.S. Gilbert, The Yeomen of the Guard, Act II (1888).

. During cross-examination of the defense’s psychiatric expert, some mention was made of a hospital record that indicated Alcantara had food and water at some point. It was unclear who had provided this information or when Alcantara had either possessed or been given the food and water, and no mention was made of Alcantara’s backpack. The record itself was not introduced into evidence.

. Because we reverse on the basis of prosecu-torial misconduct, we need not reach Alcan-tara's argument that the jury instructions misstated the law. We have, however, repeatedly upheld the use of the Ninth Circuit model jury instruction on reasonable doubt. See, e.g., United States v. Ruiz, 462 F.3d 1082, 1087 (9th Cir.2006); United States v. Clayton, 108 F.3d 1114, 1118 (9th Cir.1997); see also United States v. Meraz-Olivera, 472 Fed.Appx. 610, 612 (9th Cir.2012) (rejecting the same arguments Alcantara makes here).